[Nos. F035228, F036026. Fifth Dist. Jan. 3, 2002.]

HONGKHAM SOUVANNARATH, Plaintiff and Respondent, v.
DAVID HADDEN et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I. and III.

†Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**COUNSEL**

Phillip S. Cronin, County Counsel, and Juliana F. Gmur, Deputy County Counsel, for Defendants and Appellants.

Catherine Campbell for Plaintiff and Respondent.

**OPINION**

**DIBIASO, J.—**

STATEMENT OF THE CASE

This is an appeal from a judgment directing the issuance of a writ of mandate. From July 30, 1998, to May 27, 1999, respondent Hongkham Souvannarath was detained in the Fresno County jail pursuant to an order of quarantine and isolation signed by appellant and defendant Dr. David Hadden, the Fresno County Health Officer. The detention was based upon Souvannarath's noncompliance with the plan prescribed to treat her multi-drug-resistant tuberculosis (TB). On June 10, 1999, after her release, Souvannarath filed a petition for writ of mandate in Fresno County Superior Court. Relying upon Health and Safety Code[1] sections 121364, 121365, 121366 and 121358,[2] she sought an order directing appellant and defendant Fresno County (County) to desist from placing noncompliant TB patients such as Souvannarath in the county jail. The petition was amended on June 29, 1999, to include a request for attorney fees pursuant to Civil Code section 1021.5. The petition also named, as defendants, appellants Betty Tarr, the Division Manager of Fresno County Health Services Agency (Department); Dr. Michael J. Reynolds, the Public Health Physician and County TB Control Officer; and Fresno County Sheriff Richard Pierce.[3]

After four days of hearing and full briefing by the parties, the trial court issued its statement of decision on January 19, 2000. The court found that

---

[1] All further references are to the Health and Safety Code unless otherwise noted.

[2] The cited sections are part of the state's TB control statute. (Health & Saf. Code, Pt. 5, ch. 1, § 121350 et seq.)

[3] All defendants and appellants will be referred to collectively as "appellants" unless otherwise noted.

section 121358 precluded the use of the jail as a detention facility for noncompliant TB patients and concluded there was no evidence County had complied, or would in the future comply, with the procedural requirements of the relevant statutes. The court rejected appellants' argument that recent changes in policy ensured County's future adherence to the law and made the issues raised by Souvannarath's petition moot. The trial court ordered issuance of a writ of mandate, and judgment was entered on February 14, 1999.

On the same date, Souvannarath filed a motion for attorney fees. By order dated April 13, 2000, fees were awarded to her, including a multiplier of 1.1.

Appellants have filed a timely notice of appeal from both the writ order (No. F035228) and the fee order (No. F036026). The two appeals were consolidated by this court on September 19, 2000.

### STATEMENT OF FACTS

TB is a resilient bacterial disease which is airborne and highly contagious and thus presents a significant risk to public health. When the disease becomes multi-drug-resistant, generally from the interruption of medications, the public is exposed to a more dangerous threat and the infected person faces a more serious illness, sometimes death. Effective treatment of a patient infected with multi-drug-resistant TB can take months and a relapse is possible within two years. A patient who fails to take medication for the disease will ultimately become contagious.

Under County's policy, any person infected with a communicable disease who resists treatment and becomes a public health hazard may be detained in the Fresno County jail. The decision to incarcerate ultimately rests with Hadden and is made after consultation with a team of individuals, including Tarr, Reynolds, nurses, translators, and other employees of County's TB control program. Fewer than 20 people have been so detained since 1995 in Fresno County.

The current procedures which govern the control of TB in Fresno County are derived from the applicable portions of the Health and Safety Code and other written guidelines offered to local health authorities, including the "Guidelines for the Civil Detention of Persistently Non-Adherent Tuberculosis Patients in California" (Guidelines). The Guidelines are promulgated by the State Department of Health Services (DHS) under the authority of section 121455.

Under the TB control statutes, TB patients who refuse treatment or who do not comply with an ordered treatment program may be detained. In

Fresno County, a detainee is first taken to the chest clinic at University Medical Center (UMC) to determine if he or she is infectious. Patients found to be infectious are detained at UMC. Patients found not to be infectious and not to have other health concerns such as mental illness or substance abuse are detained in the county jail, where treatment is provided through or at the chest clinic. TB detainees are governed by the same security policies and restrictions that govern other jail inmates, including stringent restrictions on visitation, on materials coming into the jail, on possession of comfort items such as pillows and blankets, and on privacy and exercise.

No formal survey has been made to determine whether potential facilities other than the county jail are available in Fresno County as a place of detention for noninfectious, recalcitrant tuberculosis patients, and, according to Tarr, none exist. However, there are facilities available outside the county. A civil detention facility has been operating in San Mateo County since 1998, but County has not been permitted to place detainees at this facility because the required memorandum of understanding has not been concluded between County and the facility.

County has never assessed whether the conditions in the jail meet the criteria found in the relevant state TB control guidelines or statutes. The Guidelines in part provide that the conditions of detention must be as therapeutic as possible and include such components as appropriate medical therapy, case management, discharge planning, 24-hour security, recreation facilities, mental health counseling, visiting privileges, and other accommodations consistent with the needs of the patients.[4]

Souvannarath is Laotian and speaks little English. She was diagnosed with TB in January 1998. A month later she was found to have multidrug resistant TB, which required the intravenous administration of medication and treatment at the chest clinic. In July 1998, County concluded Souvannarath was not complying with the ordered treatment program.

On July 23, 1998, County served Souvannarath with a notice and order for examination, in English, and told her she was required to appear at the chest clinic on July 28 or risk being detained for continued noncompliance. Souvannarath failed to appear at the chest clinic on the 28th. As a result, Hadden, in consultation with Tarr and Reynolds, signed and issued an order of quarantine and isolation, dated July 29, 1998, which directed that Souvannarath be detained in the county jail until she completed the prescribed course of treatment, which might extend for two years. Hadden's order did

---

[4]In addition, patients who are infectious must be kept in a negative airflow room. Such a room is available at UMC and Kaiser Hospital but not at the jail.

not state any specific reason for the detention nor did it contain a statement of Souvannarath's rights under the TB control laws to request release, to a hearing, and to court appointed counsel.

On July 30, 1998, Souvannarath was taken at gunpoint to the county jail, after being told she was being taken to the hospital. When she arrived and recognized the jail, she refused to get out of the County van until she was told she would be carried in bodily if she did not submit voluntarily. She was crying, as were her two daughters who had ridden in the van with her. She was strip-searched and forced to undress. She was initially housed in a safety cell for three days, because a Hmong officer mistranslated her Laotian comment that she was afraid to die as a suicide threat. The safety cell had no water, heat, light, bed or toilet. Thereafter, she was housed in the infirmary, where she was expected to clean up after other present inmates and was threatened by some of them. Ultimately, she was placed with the general inmate population.

Souvannarath ate the same food as the general population inmates. Only one guard occasionally provided translation services. She was unable to communicate her needs to jail personnel. All during her incarceration, Souvannarath was ill, sometimes more so than others.

Souvannarath was subject to the same restrictions as those imposed upon all jail inmates. She was allowed visits for a half hour twice weekly. A glass security barrier separated her from her family, who visited on each permitted occasion. She was allowed to make only collect, surcharged telephone calls. She was handcuffed and shackled at her wrists, ankles and waist whenever she was taken from the jail to outside locations, such as the clinic or the hospital. When she was in the hospital, she was chained to a bed.

On May 17, 1999, after the Fresno County Counsel's Office became involved in the matter, Souvannarath was served with a new notice of detention and her case was set for hearing on the superior court's calendar by means of a County petition for an order of continued detention. The new notice was intended to correct the documentary and procedural errors inherent in the original notice and the prior handling of Souvannarath's case. Counsel was appointed for Souvannarath. At a May 27, 1999 hearing, the parties agreed that Souvannarath would be released from jail and placed on electronic monitoring. She was later threatened with rearrest when negotiations broke down between County and Souvannarath's counsel concerning when and whom she was to see for medical treatment. At a review hearing on July 19, 1999, the parties stipulated to Souvannarath's unconditional release from detention.

After the county counsel's office became involved in Souvannarath's case, the Department developed new forms for use in civil detention cases under the TB control laws. These new forms were intended to both comply with the provisions of such laws regarding the content of required notices and other documents and papers and to ensure County's future compliance with the procedures directed by those laws.

DISCUSSION

I.  *Standard of Review**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

II.  *Statutory Scheme*

California's Health and Safety Code contains within it provisions dedicated to the care and control of serious communicable diseases. Chapter 3 of part I describes the functions and duties of the local health officer (§§ 120175-120250) and gives this official authority to order various actions, including an order for examination of a person thought to be infected and an order of quarantine for such person in a secure "building, house, structure or other shelter." (§ 120225). In chapter 4 of part I, a violation of a valid order of a local health official authorized to so act under the Health and Safety Code is made a misdemeanor subject to criminal penalties, including fines and/or incarceration in the county jail. (§§ 120275 & 120280.)

Chapter 1 of part 5, commencing with section 121350, deals specifically with TB control. It was enacted in 1995 and contains a variety of provisions addressing the care, detention and release of TB patients at the county level. (Stats. 1995, ch. 415, § 5.) Section 121365 requires each local health officer to investigate all active cases of TB in his or her jurisdiction. The same section allows the local health officer to issue any orders deemed necessary to protect the public health, including orders for examinations, for detentions in a health facility or other treatment facility, and for a prescribed course of treatment. (§ 121365.) The section also expressly authorizes the detention of an individual when there is a "substantial likelihood, based on the person's past or present behavior, that he or she cannot be relied upon to participate in or complete an appropriate prescribed course of medication for tuberculosis disease and, if necessary, follow required infection control precautions for tuberculosis disease." (§ 121365.) The "past or present" behavior which will support detention under the section includes the refusal or failure to take medication, to keep appointments, to complete treatment, or to comply with infection control precautions. (§ 121365.)

*See footnote, *ante*, page 1115.

Section 121366 allows a local health officer to place a noncompliant TB patient subject to a section 121365 detention order "in a hospital or other appropriate place for examination or treatment." Though such a placement may be ordered by the local health officer without prior court authorization, the statute imposes a number of conditions and restrictions upon a detention, as follows: "[W]hen a person detained pursuant to subdivision (a), (d), or (e) of Section 121365 has requested release, the local health officer shall make an application for a court order authorizing the continued detention within 72 hours after the request or, if the 72-hour period ends on a Saturday, Sunday, or legal holiday, by the end of the first business day following the Saturday, Sunday, or legal holiday, which application shall include a request for an expedited hearing. After the request for release, detention shall not continue for more than five business days in the absence of a court order authorizing detention. However, in no event shall any person be detained for more than 60 days without a court order authorizing the detention. The local health officer shall seek further court review of the detention within 90 days following the initial court order authorizing detention and thereafter within 90 days of each subsequent court review." (§ 121366.)

Section 121367 directs that an order issued under section 121365 must contain the following, among other things:

1. A statement of the legal authority under which the order was issued;

2. An individualized assessment of the circumstances or behavior upon which the order was based;

3. A description of the less restrictive treatment alternatives attempted or considered and the reasons why such alternatives were either unsuccessful or rejected;

4. A statement of the period of time during which the order will remain effective;

5. A notice that the person detained may request release and that detention may not be continued for more than five days in the absence of a court order if release is requested;

6. A notice that the local health officer is required to obtain a court order authorizing the detention within 60 days after commencement of the detention and thereafter seek court review of the detention at 90-day intervals;

7. A notice that the detainee has a right to counsel, either retained or provided. (§ 121367.)

The section also requires that the order be accompanied by a separate notice which tells the detainee about the right to request release, the five-day limit on the detention in the absence of a court order, and the right to counsel, as well as the right to select not more than two individuals to be notified of the detention by the local health officer. (§ 121367.)[5]

In 1997, section 121358 was added to chapter 1 of part 5; it reads:

"(a) Notwithstanding any other provision of law, individuals housed or detained through the tuberculosis control, housing, and detention program *shall not reside in correctional facilities,* and the funds available under that program with regard to those individuals shall not be disbursed to, or used by, correctional facilities. This section shall not be interpreted to prohibit the institutionalization of criminals with tuberculosis in correctional facilities.

"(b) The department shall work with local health jurisdictions to identify a detention site for recalcitrant tuberculosis patients appropriate for each local health jurisdiction in the state. The department shall notify all counties of their designated site by January 1, 1998." (Italics added.)

III. *Mootness*\*

. . . . . . . . . . . . . . . . . . . . . . . .

IV. *Section 121358*

Appellants contend section 121358 does not prohibit the use of the jail to detain noncompliant TB patients because the statute was intended to have nothing more than a fiscal effect. According to appellants, the goal of the statute, to discourage counties from using jails to house TB detainees by withdrawing state funding from the counties for such use, was effectuated because no state funds were used to support the detention of TB patients, including Souvannarath, in the Fresno County jail.

We need go no further than the words of the statute. Section 121358 states without qualification or condition that persons "housed or detained through

---

[5]Section 121368 puts additional limits on the detention, including the provision that a person detained pursuant to section 121365, subdivision (e) cannot be held once he or she has completed an appropriate prescribed course of medication. Sections 121369 and 121370 address language and religious concerns. Other sections of chapter 1 of part 5 deal with record keeping, burial expenses, reporting, funding, and out-of-county confinement. (§§ 121390, 121395, 121400, & 121450.) Section 121455 provides that DHS may establish standards and procedures for the operation of the local tuberculosis control program.

\*See footnote, *ante,* page 1115.

the tuberculosis control, housing, and detention program *shall not reside* in correctional facilities." (§ 121358, italics added.) The words "shall not" are as unambiguous as any two contiguous words in the English language can be and they cannot rationally be misunderstood. ■ Where the language of a statute is clear, its plain meaning must be effectuated. (*Great Lake Properties, Inc. v. City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244]; *Leroy T. v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665]; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1010 [78 Cal.Rptr.2d 272].)

■ The clause in section 121358 which prohibits the use of state TB funding to support jail detentions does not overcome the clause which prohibits jail detentions or compel a construction of the statute which makes such detentions elective at the county level. Appellants want us to read the statute as if it contained only the prohibition against the use of state money to support jail detentions. But the statute obviously is not so written. (See *County of Sacramento v. Superior Court* (1971) 20 Cal.App.3d 469, 472 [97 Cal.Rptr. 771] [The courts cannot construe a statute so as to omit a portion].) Instead, the jail detention ban exists at the forefront of the section. The subsequent funding ban is linked to the jail detention ban by the conjunction "and," which commonly means "along with" or "together with" (Webster's 3d New Internat. Dict. (1986) p. 80). This grammatical structure means the jail prohibition must be given at least equal dignity with the funding prohibition. (See *People v. One 1940 Chrysler Coupe* (1941) 48 Cal.App.2d 546, 549 [120 P.2d 117] [The ordinary rules of grammar must be followed so long as the result is not an absurdity].)

The last sentence of subdivision (a) supports this construction; it requires that section 121358 "not be interpreted to prohibit the institutionalization of criminals with tuberculosis in correctional facilities." This explanatory provision would appear to be superfluous if the Legislature did not intend to forbid jail detentions of noncompliant TB patients when done at county rather than state expense. If the Legislature found it necessary to point out that a certain type of TB patient—i.e., one who is also a criminal—was not subject to a prohibition against jail detention contained in subdivision (a) of the section, then the Legislature must have thought it included in subdivision (a) of the section a prohibition against jail detention that applied to another type of TB patient—i.e., one who is not also a criminal.

Moreover, we can perceive in the funding provision a rational legislative aim not inconsistent with the purpose or effect of the jail provision. The Legislature could reasonably have determined that the express withdrawal of state funding was an emphatic means by which to ensure that counties would

not be tempted to disregard the jail ban for purposes of expedience or economy.

The reference in the statute to "the tuberculosis control, housing, and detention program" does not, as appellants assert, restrict the application of section 121358 to only "state" DHS tuberculosis control schemes, nor does it distinguish between the "state" program and the County's purported "local" program, authorized, in appellants' view, by the grant in sections 121365 and 121366 to local health officers, as opposed to a state officer, the discretion to select the appropriate place to detain and treat recalcitrant TB patients.

First, it is nonsense to postulate, as appellants do, that the Legislature inserted, into chapter 1 of part 5, a statute, section 121358, which was and is entirely irrelevant and inapplicable to everything else contained in chapter 1 of part 5. As we explained earlier, chapter 1 of part 5 sets up a two-level, statewide program for TB control, with the state as the "lead agency" charged with the administration of state funds made available for the care of TB patients. (§§ 121350, 121357.) The local health officer, however, is given responsibility to carry out the mandates of the TB control statutes and to implement at the county level the state's TB control program, including the detention and housing of noncompliant patients. (§§ 121361, 121365, 121366.) The legislative declaration found in section 121360 itself reflects that the counties are the intended focus for the implementation of the statewide program; the declaration states in relevant part that "all proper expenditures that may be made by any *county*," pursuant to chapter 1 of section 5, are "necessary for the preservation of the public health of the *county*." (§ 121360, italics added.) If there is in effect any separate "state" DHS tuberculosis program authorized by the Legislature, it is nowhere the subject of chapter 1 of part 5.

Appellants acknowledge they are subject to relevant provisions of chapter 1 of part 5 other than section 121358. The order of detention for Souvannarath was issued under the authority granted by sections 121365 and 121366 to local health officials such as Hadden, and appellants have argued in part on this appeal, as they argued in the trial court, that Souvannarath's petition should have been dismissed as moot because appellants demonstrated they were in compliance with section 121367, which prescribed the required contents of detention orders and notices. Appellants have given us no persuasive reason or authority which supports their desire to avoid the constraints of section 121358.

Second, section 121358 commences with the words "Notwithstanding any other provision of law." ▮ This phrase has a special legal connotation; it

is considered an express legislative intent that the specific statute in which it is contained controls in the circumstances covered by that statute, despite the existence of some other law which might otherwise apply to require a different or contrary outcome. (See *McClatchy Newspaper v. Superior Court* (1988) 44 Cal.3d 1162, 1182 [245 Cal.Rptr. 774, 751 P.2d 1329]; *People v. DeLaCruz* (1993) 20 Cal.App.4th 955, 963 [25 Cal.Rptr.2d 202]; *In re Marriage of Dover* (1971) 15 Cal.App.3d 675, 678, fn. 3 [93 Cal.Rptr. 384].) ▇▇▇ Thus, although a local health officer may have been granted broad general discretion under chapter 1 of part 5 to select the place of detention for noncompliant TB patients, that discretion was intended by the Legislature to be circumscribed by the flat prohibition against jail detention contained in section 121358. (*Bailey v. Superior Court* (1977) 19 Cal.3d 970, 978-979, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394].)

If there were any ambiguity in section 121358—and we do not find any—it would be resolved by the legislative history of the statute.[8] (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617] ["The courts must give statutes a reasonable construction which conforms to the apparent purpose and intention of the lawmakers"]; *Tyrone v. Kelley* (1972) 9 Cal.3d 1, 10-11 [106 Cal.Rptr. 761, 507 P.2d 65] [A statute must be read so as to conform with legislative intent].) First, the legislative materials indicate that section 121358 was intended to be applicable to detentions authorized under chapter 1 of part 5 of the Health and Safety Code. ▇▇▇ ▇ ▇ The Legislative Counsel's Digest summarized the bill which led to the enactment of the section as one that would "prohibit individuals housed under *this program,* other than criminal offenders, from residing in correctional facilities." (Legis. Counsel's Dig., Sen. Bill No. 391 (1996-1997 Reg. Sess.), ch. 294, italics added.)[9] According to the digest, the "program" referred to is the "tuberculosis control, prevention, and detention program" which is administered by the DHS "*and each county.*" The digest's description is consistent with the Enrolled Bill Report prepared by the Department of Finance, which states that the bill approved the administration's proposal to *expand housing opportunities* for TB patients unwilling to complete prescribed drug treatments, and amended the statutory scheme to require "(1) that patients housed solely for *TB treatment purposes* may not be housed in correctional facilities,

---

[8]Appellants have requested that we take judicial notice of the legislative history of section 121358 which they provided the court in their request filed July 11, 2000. We hereby grant the request.

[9]The digest constitutes the official summary of the legal effect of the bill and is relied upon by the Legislature throughout the legislative process. Thus, it is recognized as a primary indication of legislative intent. (See *Eu v. Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289]; *People v. Superior Court* (1969) 70 Cal.2d 123, 129 [74 Cal.Rptr. 294, 449 P.2d 230].)

(2) that none of the funds may be paid to such facilities, and (3) that DHS work with local health jurisdictions to identify detention sites and notify all counties of their designated sites by January 1, 1998." (Dept. of Fin., Enrolled Bill Rep. on Sen. Bill No. 391 (1996-1997 Reg. Sess.) Aug. 13, 1997, p. 8.)

Second, the Legislature apparently refused to enact a proposed version of the statute which would have permitted the housing of recalcitrant TB patients in the jails. (See *Rich v. State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512].) The Enrolled Bill Report prepared by the Department of Finance also mentioned the prohibition in the bill against the use of state funds for jail detentions and then noted that "[a]lthough it is not DHS's plan or intent to acquire jail beds with these funds, local health officers advised DHS against this restrictive language since it would limit local flexibility in placing TB patients in the event jail beds are the only beds available for this new program." (Dept. of Fin., Enrolled Bill Rep. on Sen. Bill No. 391 (1996-1997 Reg. Sess.) Aug. 13, 1997, pp. 8-9.) It would thus seem that, despite the concerns of DHS and local health authorities that a funding restriction would prevent counties from using jail beds to detain noncompliant TB patients, the Legislature rejected the proposition that jail was an appropriate place to detain TB patients and instead passed the statute with the express bar against such detentions.

We recognize that the legislative history of section 121358 includes the Enrolled Bill Report prepared by DHS which stated in part that the bill would forbid the use of tuberculosis funding for detaining nonadherent TB patients in correctional facilities. (Dept. of Health Services, Enrolled Bill Rep. of Sen. Bill No. 391 (1996-1997 Reg. Sess.) Aug. 14, 1997, p. 3.) To the extent this brief comment may be seen as supporting the construction of the statute advanced by appellants, it is inconsistent with the balance of the relevant legislative history and does not support a reading of the statute *as enacted* which effectively obliterates the direct, unambiguous jail prohibition the law contains. Moreover, given DHS's support for a law that would have allowed use of jail to detain TB patients, it is not surprising DHS's report on the bill focused solely on the funding aspect of the statute.

It is not within this court's power to release appellants from their statutory obligations simply because the task given them by the Legislature proves difficult or costly in Fresno County. Here, by the language and legislative background of the statute, the Legislature unmistakably intended to prohibit the use of jails as TB detention facilities even though the restriction might

place a burden on a particular county to identify and fund a different housing option. Subdivision (b) of the statute specifically acknowledges and addresses this burden by placing a corresponding duty upon DHS to work with the local health officers to identify proper placements for noncompliant TB patients. (§ 121358, subd. (b).) The trial court did not err in finding that appellants violated section 121358 by placing Souvannarath in the county jail.

## DISPOSITION

The judgment is affirmed. Respondent is awarded appellate costs.

Ardaiz, P. J., and Reed, J.,* concurred.

On February 1, 2002, the opinion was modified to read as printed above.

---

*Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.