[No. S121009. Dec. 22, 2005.]

THE PEOPLE ex rel. BILL LOCKYER, as Attorney General, etc., Plaintiff and Respondent, v.
R.J. REYNOLDS TOBACCO COMPANY, Defendant and Appellant.

710

**Counsel**

Howard Rice Nemerovski Canady Falk & Rabin, Marc Haber, Chandra Miller Fienen; Dechert LLP and H. Joseph Escher III for Defendant and Appellant.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Mayer, Brown, Rowe & Maw, Kenneth S. Geller and Donald M. Falk for The Product Liability Advisory Council as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Richard M. Frank and Tom Greene, Chief Assistant Attorneys General, Dennis Eckhart, Assistant Attorney General, Peter M. Williams and Michelle Fogliani, Deputy Attorneys General, for Plaintiff and Respondent.

David C. Vladek; Law Offices of Marvin E. Krakow, Marvin E. Krakow; Alan B. Morrison; Donald W. Garner; Speir & Whitney and Richard J. Whitney for Public Citizen, Inc., as Amicus Curiae on behalf of Plaintiff and Respondent.

John Cary Sims; David C. Vladeck, Richard McKewen; and Brian Wolfman for Public Citizen, Inc., and National Center for Tobacco-Free Kids as Amici Curiae on behalf of Plaintiff and Respondent.

Catherine I. Hanson and Hans P. Lee for California Medical Association, American Academy of Pediatrics, American Cancer Society, American Heart Association, American Lung Association and American Medical Association as Amici Curiae on behalf of Plaintiff and Respondent.

Colantuono & Levin, Michael G. Colantuono and Hannah Bentley for League of California Cities, California State Association of Counties and Tobacco Control Legal Consortium as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Declaring smoking to be "the single most important source of preventable disease and premature death in California," the Legislature in 1991 enacted a statute prohibiting cigarette companies from distributing cigarettes as free samples, as they might fall into the hands of children and lead them to become addicted to tobacco, and encouraging "all persons to quit tobacco use." (Stats. 1991, ch. 829, § 1, p. 3676, enacting former Health & Saf. Code, § 25967, subd. (a)(11), repealed by Stats. 1995, ch. 415, § 163, p. 3335 and reenacted in 1995 as Health & Saf. Code, § 118950, subd. (a)(11).)[1] This statute prohibits the "nonsale distribution" of cigarettes on public property[2] (§ 118950, subd. (b)), *except for* public property leased for a private function to which minors are "denied access" (*id.*, subd. (f)). "Each distribution of a single package . . . to an individual member of the general public" constitutes a violation and is punished by a civil penalty of not less than $200 for one act, $500 for two acts, and $1000 for each succeeding act. (*Id.*, subd. (d).)

The trial court found that defendant tobacco company had violated section 118950 at six events in 1999 and assessed it a fine of $14,826,200. The Court of Appeal affirmed, and we granted defendant's petition for review.

This appeal presents three issues. The first is whether defendant's distribution of free cigarettes at a street fair and other events did not violate section 118950 because it occurred on property leased for a private function to which minors were denied access. The second is whether section 118950 is preempted by a federal statute that bars states from regulating the "advertising or promotion" of cigarettes. (15 U.S.C. § 1334(b).) The third is whether the

---

[1] Health and Safety Code section 118950 is cited hereafter as section 118950.

[2] This case involves cigarette distribution in 1999. In 2001, the Legislature amended section 118950. Among other matters, the amendment expanded the prohibition on nonsale distribution of cigarettes to "any private property that is open to the general public." (§ 118950, subd. (b).)

$14,826,200 fine assessed against defendant violates state or federal constitutional provisions barring excessive fines. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) Each issue is a close and difficult one.

## I. Factual and Procedural Background

The following facts are undisputed. At six different events held on public property between February and October of 1999, defendant tobacco company gave away cartons and packages containing a total of 108,155 packs of cigarettes to 14,834 people. One event was the Sunset Junction Street Fair in Los Angeles; the others were a motorcycle race at the Del Mar Fairgrounds, an auto race at the Los Angeles County Fairgrounds, a car show at Verdugo Park in Los Angeles, the San Jose International Beer Festival, and the Long Beach Jazz Festival. On each occasion, defendant contracted with the event promoter to set up a booth or a tent. Defendant posted security guards to bar minors from entering the booth or the tent. Inside, defendant distributed cigarettes only to people who could prove that they were current smokers (recipients had to show that they already had a pack of cigarettes) and who presented identification showing that they were at least 21 years old. Defendant asked recipients to fill out a survey card on which the recipient agreed to be added to defendant's mailing list and to receive promotional offers.

The state Attorney General sued defendant in 2001, charging it with violating section 118950 at the six 1999 events. The parties stipulated to the pertinent facts relating to defendant's practices at the six 1999 events, and filed cross-motions for summary judgment. The trial court found that federal law did not preempt section 118950 and that defendant violated that statute by distributing cigarettes on public property. It entered a judgment fining defendant $14,826,200.[3] The Court of Appeal affirmed the judgment in a two-to-one decision. We granted defendant's petition for review.

## II. The "Safe Harbor" Provision of Health and Safety Code Section 118950, Subdivision (f)

██ Section 118950, subdivision (b), provides: "It is unlawful for any person, agent, or employee of a person in the business of selling or distributing smokeless tobacco or cigarettes from engaging in the *nonsale* distribution of any smokeless tobacco or cigarettes to any person in any public building, park or playground, or on any public sidewalk, street, or other public grounds . . . ." (Italics added.) A " '[p]ublic building, park, playground, sidewalk, street, or other public grounds' " is defined as "any

---

[3] The trial court, following the language of section 118950, subdivision (d), imposed a fine of $200 for the first violation at each event, $500 for the second violation, and $1000 for each succeeding violation.

structure or outdoor area that is owned, operated, or maintained by any public entity, including," among other things, "streets and sidewalks, parade grounds, fair grounds, . . . [and] public recreational facilities." (*Id.*, subd. (c)(3).)

■ Section 118950, subdivision (f), the so-called safe harbor provision, operates as an exception to the prohibition of section 118950, subdivision (b). Subdivision (f) states that the prohibition on nonsale distribution of tobacco products does not apply to any public property "leased for private functions where minors are denied access by a peace officer or licensed security guard on the premises."

The Attorney General first contends that notwithstanding defendant's posting of security guards to exclude minors and nonsmokers from its tents and booths, the safe harbor provision does not protect defendant's conduct because defendant did not "lease" the sites where it distributed cigarettes; instead, according to the Attorney General, defendant's occupancy right to those sites is more properly described as a license or permit. Defendant, however, points out that the law relating to leases of public property, the General Leasing Law (Pub. Resources Code, § 6501 et seq.), states: "As used in this chapter [Public Resources Code, division 6, part 2, chapter 1], 'lease' includes a permit, easement, or license." (*Id.*, § 6501.) Because Health and Safety Code section 118950, the statute at issue here, is not part of the chapter containing the General Leasing Law, it is not governed by the definitions set forth in the General Leasing Law. We agree with defendant, however, that it is unlikely that the Legislature intended that a cigarette company's right to distribute free cigarettes would depend on the technical character of the cigarette distributor's occupancy—whether it falls into the category of a lease, a license, or a permit—because that has no bearing on the harm caused by the free distribution of cigarettes, an express concern of the Legislature.

The Attorney General's primary contention, however, is that defendant did not exclude minors from the property within which cigarettes were distributed. As we noted earlier, the safe harbor provision (§ 118950, subd. (f)) allows distribution within any public property "leased for private functions where minors are denied access . . . ." Adopting the Court of Appeal's construction of that statutory language, the Attorney General argues that in the context of this case the safe harbor provision would apply only if minors were excluded from the event within which defendant was distributing free cigarettes, not merely from defendant's booth or tent where cigarettes were distributed. Defendant disagrees, contending that the statutory phrase pertaining to public property "leased for private functions" (*ibid.*) refers only to the specific site it leased and from which it distributed cigarettes.

■ When, as here, the statutory language " ' "is susceptible of more than one reasonable interpretation . . . , we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " (*People v. Jefferson* (1999) 21 Cal.4th 86, 94 [86 Cal.Rptr.2d 893, 980 P.2d 441], quoting *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970].)

Both parties argue that the legislative history of section 118950 supports their position. The Attorney General notes that in 1991, State Senator Doris Allen suggested to State Senator Marian Bergeson, the author of Senate Bill No. 1100 (1991–1992 Reg. Sess.) (which later became section 118950), that the bill be amended to allow portions of public grounds used for a private function to be exempt from the statutory prohibition on free distribution of cigarettes. Senator Bergeson rejected that proposal. According to the Attorney General, this exchange shows that the Legislature rejected the view that a safe harbor could consist of a portion of public grounds used for a private function. Not so. The Legislature did not vote on Senator Allen's proposed amendment and there is no evidence that other legislators were even aware of the exchange between Senator Allen and Senator Bergeson. (See *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 701 [170 Cal.Rptr. 817, 621 P.2d 856].)

Defendant contends that the legislative history of section 118950 supports its position. It points to a third reading analysis of Senate Bill No. 1100 (1991–1992 Reg. Sess.), prepared by the Senate staff, that stated: "The language about public facilities leased for private functions suggests that booths, tents or barricaded areas may be used for sampling if there is a uniformed guard present." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1100 (1991–1992 Reg. Sess.) as amended Sept. 9, 1991.) This analysis of Senate Bill No. 1100 is a document that the legislators had the opportunity to consult in enacting that bill, and hence it could be relevant to determining the legislators' intent. (See *Jevne v. Superior Court* (2005) 35 Cal.4th 935, 948 [28 Cal.Rptr.3d 685, 111 P.3d 954].) But the language of the analysis, although relevant, is not highly persuasive, because it merely suggests one possible interpretation of section 118950 without indicating that the suggested interpretation is what the legislators actually intended.

Thus, the legislative history of section 118950 contains little that specifically addresses the scope of subdivision (f)'s safe harbor provision. Subdivision (f), however, is but one part of section 118950, and the Legislature, in subdivision (a) of section 118950, has set out specifically the findings and intent underlying the statute as a whole:

"(1) Smoking is the single most important source of preventable disease and premature death in California. [¶] . . . [¶]

"(4) Despite laws in at least 44 states prohibiting the sale of tobacco products to minors, each day 3,000 children start using tobacco products in this nation. Children under the age of 18 years consume 947 million packages of cigarettes in this country yearly.

"(5) The earlier a child begins to use tobacco products, the more likely it is that the child will be unable to quit.

"(6) More than 60 percent of all smokers begin smoking by the age of 14 years, and 90 percent begin by the age of 19 years. [¶] . . . [¶]

"(9) Tobacco product advertising and promotion are an important cause of tobacco use among children. More money is spent advertising and promoting tobacco products than any other consumer product.

"(10) Distribution of tobacco product samples and coupons is a recognized source by which minors obtain tobacco products, beginning the addiction process.

"(11) It is the intent of the Legislature that keeping children from beginning to use tobacco products in any form and encouraging all persons to quit tobacco use shall be among the highest priorities in disease prevention for the State of California."[4]

■ When the Legislature has expressly declared its intent, we must accept the declaration. (*Tyrone v. Kelley* (1973) 9 Cal.3d 1, 11 [106 Cal.Rptr. 761, 507 P.2d 65]; see *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 256–257 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Souvannarath v. Hadden* (2002) 95 Cal.App.4th 1115, 1126 [116 Cal.Rptr.2d 7]; *Barker v. Brown & Williamson Tobacco Corp.* (2001) 88 Cal.App.4th 42, 49 [105 Cal.Rptr.2d 531].) Consequently, we must here construe section 118950, subdivision (f)'s safe harbor provision, allowing the free distribution of cigarettes on public property "leased for private functions where minors are

---

[4] The statement of legislative intent in section 118950, subdivision (a)(11) does not stand alone; it is one of many enactments expressing the Legislature's concern over the economic and health burdens arising from tobacco use. "In 1995, the California Legislature found that '[t]obacco-related disease places a tremendous financial burden upon the persons with the disease, their families, the health care delivery system, and society as a whole,' and that 'California spends five billion six hundred million dollars ($5,600,000,000) a year in direct and indirect costs on smoking-related illnesses.' " (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 831 [123 Cal.Rptr.2d 40, 50 P.3d 751], quoting Health & Saf. Code, § 104350, subd. (a)(7).)

denied access," to conform to the Legislature's express intent to keep children "from beginning to use tobacco products" and to encourage all persons to quit using tobacco. (*Id.*, subd. (a)(11).) Because free distribution of cigarettes encourages tobacco use, and in particular "is a recognized source by which minors obtain tobacco products" (*id.*, subd. (a)(10)), a statutory interpretation that restricts the free distribution of cigarettes conforms to the legislative purpose. ■ When, as in this case, a civil statute is enacted for the protection of the public, it must be "broadly construed in favor of that protective purpose." (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 [58 Cal.Rptr.2d 855, 926 P.2d 1042].)

We note that after defendant's distribution of free cigarettes in 1999, the Legislature in 2001 amended section 118950 to extend the prohibition on nonsale distribution of cigarettes to "any private property that is open to the general public" (Stats. 2001, ch. 376, § 3 [amending section 118950, subdivision (b), which had previously only prohibited free distribution of cigarettes on public property]). The Legislature also added a new safe harbor provision for private property open to the general public, stating that the statutory prohibition on nonsale distribution of cigarettes "does not apply to any private property that is open to the general public where minors are denied access to a separate nonsale distribution area by a peace officer or licensed security guard stationed at the entrance of the separate nonsale distribution area and the separate nonsale distribution area is enclosed so as to prevent persons outside the separate nonsale distribution area from seeing the nonsale distribution unless they undertake unreasonable efforts to see inside the area." (§ 118950, subd. (g).)

■ Thus, section 118950 now contains two safe harbor provisions—one for public property (*id.*, subd. (f)) and one for private property (*id.*, subd. (g))—with significantly different wording. The safe harbor provision for *public property* permits free distribution of cigarettes on public property "leased for private functions where minors are denied access by a peace officer or licensed security guard on the premises." (*Id.*, subd. (f).) The safe harbor provision for *private property open to public use* permits free distribution of cigarettes "where minors are denied access to a separate nonsale distribution area" enclosed to prevent persons outside that area from observing the distribution. (*Id.*, subd. (g).)

■ What is the significance of the difference between the two safe harbor provisions? "When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning." (*People v. Trevino* (2001) 26 Cal.4th 237, 242 [109 Cal.Rptr.2d 567, 27 P.3d 283]; see *People v. Gardeley* (1996) 14 Cal.4th 605, 621–622 [59 Cal.Rptr.2d

356, 927 P.2d 713].) Subdivision (g) of section 118950, as we have noted, permits free distribution of cigarettes within "a separate nonsale distribution area" carved out from the whole of the property open to public use, thereby making it clear that minors need not be excluded from the entire property, but only from a portion of that property. Subdivision (f) of section 118950, on the other hand, applies only if minors are denied access to public property "leased for private functions." ■ Reading the two provisions together, and mindful of the rule of construction that significant differences in language imply a difference in meaning, it is reasonable to conclude that the Legislature intended to impose greater restrictions on cigarette distribution on public property than on private property, and hence that subdivision (f) should be construed to require that minors be excluded entirely from a private function that is held on leased public property.

■ Defendant contends that interpreting the public property safe harbor provision (§ 118950, subd. (f)) to require exclusion of minors from the event, and not merely from its own booth or tent, will effectively preclude it from distributing free cigarettes at street fairs, festivals, and other large public events, and will as a practical matter limit the safe harbor provision to smaller affairs with limited attendance where exclusion of minors is feasible. But this limitation appears to be exactly what the Legislature intended when it made the safe harbor provision applicable only to public property "leased for *private functions.*" (*Id.*, subd. (b), italics added.) The Legislature has enacted other safe harbor provisions that, like section 118950, subdivision (f), refer to "private functions": For instance, Health and Safety Code section 118900, subdivision (a), requires nonsmoking areas in restaurants except for "banquet rooms in use for private functions"; Business and Professions Code section 25503.16, subdivision (a)(5) prohibits the sale of alcohol at a marine park "except during private events or private functions"; and Business and Professions Code section 23358 permits wineries to sell other producers' "beers, wines, and brandies," but only "during private events or private functions not open to the general public." In each of these provisions, the context suggests that by "private functions" the Legislature primarily had in mind parties, receptions, meetings, and similar limited-attendance gatherings. Accordingly, it is reasonable to infer that the phrase "private functions" in section 118950, subdivision (f), does not include fairs, festivals, and similar events open to the general public unless minors are excluded from the entire event. So limiting the events at which cigarettes may be freely distributed furthers the Legislature's goals to keep children from starting to use tobacco products and to encourage smokers to quit. (*Id.*, subd. (a)(11).)

■ In accord with the Legislature's expressed declarations and purpose, we construe section 118950 as banning nonsale distribution of cigarettes at events held on public property where adults and minors are present. We next consider whether section 118950 is preempted by federal law.

### III. PREEMPTION

 The Federal Cigarette Labeling and Advertising Act (FCLAA) prohibits states from regulating the "advertising or promotion" of cigarettes. (FCLAA, 15 U.S.C. § 1334 (hereafter section 1334).) The issue here is whether a tobacco company's free distribution of cigarettes is a form of "promotion" that states cannot regulate. The United States Supreme Court has not construed the term "promotion" in the federal act, but in a number of recent cases it has described the scope of federal preemption of state laws, including two cases construing the term "advertising" in the federal act. (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525 [150 L.Ed.2d 532, 121 S.Ct. 2404] (*Lorillard*); *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*).) We will review the text and history of the FCLAA, analyze the leading United States Supreme Court cases, and then apply the principles established by those cases.

### A. *The Federal Cigarette Labeling and Advertising Act*

 The FCLAA, enacted by Congress in 1965, prohibits manufacturing, packaging, or importing for sale or distribution any cigarettes whose package fails to bear specified Surgeon General's warnings. (15 U.S.C. § 1333.) The phrase " 'sale or distribution' includes sampling or any other distribution not for sale." (*Id.*, § 1332(6).)

The preemption provision of the 1965 federal act prohibited states from requiring tobacco companies to add statements relating to smoking and health to cigarette labels or advertising that were not required by federal law. (See Act of July 27, 1965, Pub. L. No. 89–92, § 5, 79 Stat. 283.) In 1969, however, Congress amended the FCLAA to require stronger warnings of the dangers of smoking, and it banned cigarette advertising in "any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission." (15 U.S.C. § 1335.) At the same time, Congress expanded the scope of federal preemption by amending section 1334(b) in the federal act to provide: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising *or promotion* of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." (Italics added.) At issue here is whether section 1334, by banning state regulation of the "promotion" of cigarettes, prohibits a state from regulating the free distribution of cigarettes.

Although there is considerable congressional history explaining the 1965 enactment of the FCLAA and the 1969 amendments to that act, it all concerns the effects of smoking on health. There is nothing to explain why Congress, which in 1965 preempted states only from regulating cigarette advertising,

amended the FCLAA in 1969 to bar state regulation of advertising or promotion. And there is nothing in the congressional history to explain what Congress meant to include within the term "promotion," as used in section 1334 of the federal act.

Defendant here contends that the plain meaning of "promotion" in section 1334 includes the nonsale distribution of a product to induce recipients to try the product. Defendant points to various instances in which free distribution of product samples has been described as a promotional activity. The 1998 Federal Trade Commission report to Congress, for example, described "the 'distribution of cigarette samples and specialty gift items' [as] 'sales promotion activities.' " (*Jones v. Vilsack* (8th Cir. 2001) 272 F.3d 1030, 1035.) And the Surgeon General's 1994 report stated: "Promotional activities can take many forms," including "[f]ree samples." (U.S. Dept. of Health & Human Services, Preventing Tobacco Use Among Young People: A Report of the Surgeon General (1994) p. 159.) Also, defendant notes, two federal courts have held that the plain meaning of "promotion" in section 1334 includes the distribution of free samples. (*Jones v. Vilsack, supra,* 272 F.3d 1030; *Rockwood v. City of Burlington* (D.Vt. 1998) 21 F.Supp.2d 411.)

The problem with defendant's contention that the "plain meaning" of section 1334 bars any state regulation of the free distribution of cigarettes is that, as defendant concedes, it is clear that Congress did not intend section 1334 to preempt state regulation of the distribution of cigarettes to *minors*. To the contrary, Congress has required states to ban tobacco distribution to minors as a condition of receiving federal funds for substance abuse treatment. (42 U.S.C. § 300x-26; see *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057 [31 Cal.Rptr.2d 358, 875 P.2d 73].) There is no language in section 1334, however, that distinguishes between distribution to minors and distribution to adults. Hence, the state Attorney General here contends that the only way to effectuate Congress's intent to bar distribution of cigarettes to minors is to draw a line distinguishing between "promotion" and "distribution." Under this theory, states could not regulate actions intended to persuade persons to smoke a particular defendant's brand of cigarettes, but it could regulate the actual transfer of the cigarettes not only to minors but also to adults.

We examine below defendant's contention that the "plain meaning" of section 1334 bars state regulation of the free distribution of cigarettes and the Attorney General's contention that section 1334 should be construed to distinguish between "promotion" and "distribution" so as to permit states to regulate "distribution."

### B. *United States Supreme Court Decisions*

No United States Supreme Court decision defines the term "promotion" in section 1334 or describes its preemptive scope. Both parties, however, rely on the high court's decisions involving related preemption issues, and both can point to language in those cases supporting their positions. As Justice Scalia of the United States Supreme Court has observed, the court's members do not agree on the relative weight to be given to legislative context and history in the construction of federal statutes. (*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.* (2004) 541 U.S. 246, 256 [158 L.Ed.2d 529, 124 S.Ct. 1756].) Some justices put primary emphasis on the literal meaning of the statutory language; others put greater emphasis on the legislative context and history.

*Cipollone, supra,* 505 U.S. 504, decided in 1992, was the first decision construing the FCLAA. The issue there was whether the ban on state regulation of *advertising* in section 1334 preempted state common law actions accusing tobacco companies of failing to warn of the dangers of smoking, of fraudulent advertising, of breaching warranties that asserted that the use of cigarettes had no significant health consequences, and of conspiring to deprive the public of scientific and medical data showing the dangers of tobacco use. In a divided opinion, the high court held that the federal act preempted only the causes of action based on failure to warn of the dangers of tobacco use, but permitted the other causes of action.

Justice Stevens's opinion, joined by Chief Justice Rehnquist, Justice White, and Justice O'Connor, stated: "In our opinion, the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express language in . . . each Act." (*Cipollone, supra,* 505 U.S. at p. 517.) He noted that the 1965 preemption provision in the federal act "spoke precisely and narrowly" (*id.* at p. 518), but that "the plain language of the pre-emption provision in the 1969 Act is much broader" (*id.* at p. 520). Preemption provisions, however, must be construed "in light of the presumption against the pre-emption of state police power regulations." (*Id.* at p. 518.)

Justice Stevens concluded in *Cipollone* that the FCLAA's preemption of state regulation of advertising and promotion did not preempt common law actions for breach of warranty, even though the warranty appeared in the cigarette company's advertising, because a state law enforcing a warranty voluntarily undertaken by the company was not the same as a requirement imposed by state law. Justice Stevens also found no preemption of common law claims charging intentional fraud because the common law rule allowing tort actions for fraud was not a law primarily based on concerns about smoking and health. In reaching the latter conclusion, Justice Stevens relied

on the stated purposes of the FCLAA and a 1969 Senate report that said: "[T]he 'preemption of regulation or prohibition with respect to cigarette advertising is narrowly phrased to preempt only State action based on smoking and health. It would in no way affect the power of any State . . . with respect to the taxation or the sale of cigarettes to minors, or the prohibition of smoking in public buildings, or similar police regulations.' " (*Cipollone, supra,* 505 U.S. at p. 529, fn. 26, italics omitted, quoting Sen. Rep. No. 91-566, 2d Sess., p. 12 (1969).)

Justice Blackmun, joined by Justices Kennedy and Souter, wrote separately. Justice Blackmun asserted that "[w]e do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language." (*Cipollone, supra,* 505 U.S. at p. 533 (conc. opn. of Blackmun, J.).) He concluded that there was no evidence of unambiguous congressional intent to preempt any common law causes of action.

Justice Scalia, joined by Justice Thomas, took the opposite view, asserting: "[O]ur job is to interpret Congress's decrees of pre-emption neither narrowly nor broadly, but in accordance with their apparent meaning." (*Cipollone, supra,* 505 U.S. at p. 544 (conc. & dis. opn. of Scalia, J.).) In Justice Scalia's view, all common law causes of action were preempted.

Because Justice Stevens's plurality opinion in *Cipollone* relied on *both* the plain meaning of the FCLAA and the context and purpose of that enactment, both parties here assert that *Cipollone* supports their position. Defendant points out that the four justices who signed Justice Stevens's opinion (Chief Justice Rehnquist and Justices White, Stevens, and O'Connor), as well as dissenting Justices Scalia and Thomas, supported the use of "plain meaning" analysis; the Attorney General claims that seven justices (the four justices who signed Justice Stevens's opinion, plus Justices Blackmun, Kennedy and Souter, who wrote separately) supported reliance upon legislative context and purpose.

Another of the high court's decisions discussed by the parties is *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470 [135 L.Ed.2d 700, 116 S.Ct. 2240] (*Medtronic*). There, the issue was whether the Medical Device Amendments (MDA) of 1976 (21 U.S.C. § 360k) preempted state lawsuits for negligence and strict liability against a manufacturer of pacemakers. Although the preemptive language of the MDA does not parallel that of the FCLAA, the high court's decision in *Medtronic* not to follow a "plain meaning" interpretation of statutory language when it found that interpretation inconsistent with the congressional purpose underlying the statute bears on our resolution of a similar issue here.

The plurality opinion in *Medtronic, supra,* 518 U.S. 470, written by Justice Stevens and joined by Justices Kennedy, Souter, and Ginsberg, found no preemption of state law. It reasoned that because the purpose of the MDA was to impose more stringent regulation on the makers of medical devices, it would be contrary to the congressional purpose to grant that industry an immunity from liability for defective devices enjoyed by no other industry. Justice Breyer, who supplied the fifth vote for the result, said that in some instances the statutory language would preempt state remedies, but did not do so in that case. (*Medtronic, supra,* 518 U.S. at pp. 505–506.) Justice O'Connor, joined by Chief Justice Rehnquist, Justice Scalia, and Justice Thomas, dissented, asserting that the plain language of the MDA supported preemption. (*Id.* at pp. 510–511.)

In 2001, the United States Supreme Court returned to the matter of interpreting the FCLAA's prohibition on state regulation of advertising in *Lorillard, supra,* 533 U.S. 525. Acting under the authority of a state statute banning unfair or deceptive trade practices, the Massachusetts Attorney General had issued regulations that, among other things, barred outdoor advertising of cigarettes within 1000 feet of schools, parks, or playgrounds.[5] Writing for the majority, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia, Thomas, and Kennedy, held that section 1334 preempted the Massachusetts regulations.[6] Justice Stevens dissented, joined by Justices Souter, Ginsberg, and Breyer.

The *Lorillard* majority rejected the state's argument that federal preemption was limited to the content of advertising, not its location: "[T]he content/location distinction cannot be squared with the language of the pre-emption provision, which reaches *all* 'requirements' and 'prohibitions' 'imposed under State law.' A distinction between the content of advertising and the location of advertising in the FCLAA also cannot be reconciled with Congress' own location-based restriction, which bans advertising in electronic media, but not elsewhere." (*Lorillard, supra,* 533 U.S. at pp. 548–549.) The majority also rejected the Massachusetts Attorney General's contention that the state regulations were "not 'based on smoking and health' " because

[5] The Massachusetts Attorney General's regulations also barred free distributions of cigarettes in public places and self-service displays. In the United States Supreme Court, Lorillard Tobacco Company did *not* contend that such regulations were preempted. (See *Lorillard, supra,* 533 U.S. at pp. 536–540.) Thus, the validity of state regulation of free distribution of cigarettes, although a potential issue in *Lorillard,* was not addressed in the United States Supreme Court's opinions.

California has statutes barring cigarette advertising within 1000 feet of a school (Bus. & Prof. Code, § 22961) and banning self-service cigarette displays (*id.,* § 22962), similar to the Massachusetts regulations found invalid in *Lorillard, supra,* 533 U.S. 525.

[6] The high court majority in *Lorillard* consisted of the four justices who had dissented in *Medtronic, supra,* 518 U.S. 570 (Chief Justice Rehnquist and Justices O'Connor, Scalia, and Thomas), plus Justice Kennedy, the only justice who agreed with the result in both cases.

they targeted only smoking by minors (*id.* at p. 547): "At bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette smoking and health." (*Id.* at p. 548.)

The *Lorillard* majority, however, recognized that "[s]tates remain free . . . to regulate conduct with respect to cigarette use and sales." (*Lorillard, supra,* 533 U.S. at p. 550.) *Lorillard* also stated: "[T]he FCLAA does not pre-empt state laws prohibiting cigarette sales to minors. . . . [¶] . . . Having prohibited the sale and *distribution* of tobacco products to minors, the State may prohibit common inchoate offenses that attach to criminal conduct, such as solicitation, conspiracy, and attempt." (*Id.* at p. 552, italics added.)

## C. *Analysis*

██ The United States Supreme Court decisions we have discussed agree that in determining whether federal legislation preempts state law, "[c]ongressional purpose is the 'ultimate touchstone' of our inquiry." (*Lorillard, supra,* 533 U.S. at p. 541.) When Congress enacted the FCLAA in 1965, it explained its purpose in preempting state regulation: to ensure that "commerce and the national economy" are "not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." (15 U.S.C. § 1331(2)(B).) Congress's 1969 amendment of the FCLAA did not alter this statement of purpose.

State regulation of nonsale distribution of cigarettes would not conflict with the congressional purpose just described. Although national commerce in cigarettes would be substantially impeded if a tobacco company's cigarette labeling and advertising had to be altered to comply with the laws of every state, that is not the case for state regulation of free distribution of cigarettes. Moreover, although Congress has enacted extensive legislation governing cigarette advertising, and has authorized the Federal Trade Commission (FTC) to impose further regulations, Congress has never enacted any comprehensive laws governing nonsale distributions nor authorized the FTC to do so. In view of the health hazards of smoking expressly recognized by Congress (see 15 U.S.C. §§ 1331, 1333), it would be unreasonable to conclude that Congress intended nonsale distribution of cigarettes to continue entirely without regulation.

██ Actions by Congress after its 1969 amendment of the FCLAA also bear on the scope of the act's preemption of state law. "While 'subsequent legislation interpreting [a] statute . . . [cannot] change the meaning [of the earlier enactment,] it [does] suppl[y] an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted.' [Citation.]" (*Russ*

*Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839, 852 [244 Cal.Rptr. 682, 750 P.2d 324]; accord, *Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 788 [286 Cal.Rptr. 57]; see *Consumer Product Safety Comm'n v. GTE Sylvania* (1980) 447 U.S. 102, 118, fn. 13 [64 L.Ed.2d 766, 100 S.Ct. 2051].)

First, in 1992 Congress enacted legislation requiring states to prohibit nonsale distribution of cigarettes to *minors* as a condition of receiving federal aid for state programs to treat substance abuse. (42 U.S.C. § 300x-26.) This enactment shows that Congress did not regard the FCLAA as barring state regulation of nonsale distribution of cigarettes to minors.

Second, in 1995 Congress enacted a law requiring all federal agencies to prohibit nonsale distribution of tobacco "in or around any federal building." (Act of Nov. 19, 1965, Pub. L. No. 104-52, § 636, 109 Stat. 507.) Defendant here points out that Congress has the power to require certain conduct by federal agencies while prohibiting such conduct by state agencies. (See *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist., supra,* 541 U.S. at p. 254, fn. 6 [federal statute bars states from imposing certain emission requirements in purchasing vehicles, even though federal agencies are required to follow similar standards].) But it is difficult to conceive of a coherent policy that would bar nonsale distributions in or around federal buildings yet preclude states from barring such distributions on state property.

Third, although the FCLAA does not describe what powers are retained by the states, the high court in *Lorillard* asserted that Congress intended that the "[s]tates remain free . . . to regulate conduct with respect to cigarette use and sales." (*Lorillard, supra,* 533 U.S. at p. 550.) If the FCLAA's bar on state regulation of the promotion of cigarettes extends to barring state regulation of distribution, that prohibition could not logically be confined to nonsale distribution. Discount sales of cigarettes, sales accompanied by rebate offers, and the distribution of coupons entitling a holder to receive free or discounted cigarettes could equally be considered a form of promotion of cigarette sales and use. Thus, such a broad definition would infringe on the state's retained powers to regulate cigarette use and sales.

Indeed, in terms of smoking's adverse effect on health, there is very little distinction between the sale of cigarettes at full retail price, the sale of cigarettes at discounted prices, and the free distribution of cigarettes—all place cigarettes in the hands of the public. The FCLAA itself does not draw a distinction between sales of cigarettes and free distributions; it requires labeling of any package in which cigarettes are offered for sale "or otherwise distributed to consumers" (15 U.S.C. § 1332(4)), and it defines the term " 'sale or distribution' " as including "sampling or any other distribution not for sale." (*Id.,* § 1332(6).)

Defendant tobacco company contends that if the FCLAA's ban on state regulation of "promotion" of cigarettes does not include a ban on state regulation of free distribution of cigarettes, it will have little effect. Defendant acknowledges that section 1334 will still ban state regulation of promotional activities, such as sponsorship of sports events, that do not involve free distribution of cigarettes. But defendant argues that free distribution of cigarettes is the most important method of promoting cigarettes sales and use, because permitting a prospective consumer to try a product and judge its quality is the best way to induce the customer to buy the product.

Defendant's argument actually points to the significant distinction between free distribution on the one hand, and a sports event sponsorship or similar promotional activity on the other. Because it involves distributing cigarettes directly to the recipient, instead of merely trying to induce the recipient to purchase cigarettes, free distribution of cigarettes presents the more immediate risk of use. Distribution of cigarettes in any form, whether free of charge, sold at a discount, or sold at full retail price, creates the same health hazard, and should be equally subject to state regulation.

■ "It is equally well established that '[c]onsideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." ' " (*Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 923 [12 Cal.Rptr.3d 262, 88 P.3d 1], quoting the high court's decision in *Cipollone, supra,* 505 U.S. at p. 516; see *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 449 [161 L.Ed.2d 687, 125 S.Ct. 1788, 1801].) The high court's majority opinion in *Lorillard* (*supra,* 533 U.S. at pp. 541–542), and the plurality opinions in both *Medtronic* (*supra,* 518 U.S. at p. 475) and *Cipollone* (*supra,* 505 U.S. at p. 505) all endorse that principle.[7] We here find no "clear and manifest purpose of Congress" to bar state regulation of the nonsale distribution of cigarettes to minors or adults.

## IV. EXCESSIVENESS OF FINE

■ Subdivision (d) of section 118950 provides that anyone violating this section is liable for "a civil penalty of not less than two hundred dollars ($200) for one act, five hundred dollars ($500) for two acts, and one thousand dollars ($1,000) for each subsequent act constituting a violation." Each distribution of a single package, coupon, or rebate offer is considered a

---

[7] Justices Scalia and Thomas disagreed with the presumption against preemption of state police power measures. (See *Cipollone, supra,* 505 U.S. at p. 544 (conc. opn. of Thomas, J., joined by Scalia, J.).)

separate violation. (*Ibid.*) Based on defendant tobacco company's distribution of free cigarettes at six events in 1999, the trial court fined defendant $14,826,200.

Defendant argued in the trial court that it had attempted in good faith to comply with section 118950. Defendant and the Attorney General exchanged letters in early November of 1999 concerning defendant's plan to distribute cigarettes at auto races in Pomona on November 12 through 14. Defendant offered to locate its booth within an opaque tent with "no signage of any nature on the outside of the tent." Defendant added: "We will, of course, continue to guard rigorously access to the tent so that only smokers twenty-one years of age or older can enter." The Attorney General responded: "This addresses our concerns about the . . . booths as a locus of tobacco advertising and as a source of youth exposure (visual and auditory) to free sampling activity. We appreciate your making this important change in your marketing and promotional practices."

Defendant maintains that these letters show that in 1999, when the events at issue occurred, the Attorney General considered defendant's conduct to be protected by the safe harbor provision, section 118950, subdivision (f), which protects distribution on leased property from which minors are excluded. It claims that the Attorney General's later change of position and filing of charges took defendant by surprise. Defendant also accuses the Attorney General of delaying, until 2001, initiation of legal action against defendant to induce it to continue to distribute free cigarettes at various events, because under section 118950, subdivision (d), each distribution would increase the amount of the fine defendant might have to pay.

The trial court, however, concluded that "[g]iven the mandatory nature of the fines, [defendant's] good faith is irrelevant." The Court of Appeal agreed, rejecting defendant's contention that the amount of the fine violated the federal and state Constitutions.

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted." (Italics added.) "[T]he Due Process Clause of the Fourteenth Amendment to the Federal Constitution . . . makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States. [Citation.] The Due Process Clause of its own force also prohibits the States from imposing 'grossly excessive' punishments . . . ." (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 433–434 [149 L.Ed.2d 674, 121 S.Ct. 1678].)

The California Constitution contains similar protections. Article I, section 17, prohibits "cruel or unusual punishment" and "excessive fines"; article I, section 7, prohibits the taking of property "without due process of law."

The Court of Appeal here addressed separately whether the $14,826,200 fine was unconstitutionally excessive and whether it denied defendant due process. A separate analysis of the two constitutional provisions is, however, unnecessary. Due process analysis can be important when a defendant claims that a punitive damage award is unconstitutional, because the United States Supreme Court has held that the excessive fines clause of the Eighth Amendment to the federal Constitution does not apply to punitive damages. (*Browning-Ferris Industries v. Kelco Disposal* (1989) 492 U.S. 257, 263–264 [106 L.Ed.2d 219, 109 S.Ct. 2909].) But here the case involves a civil penalty subject both to the state and the federal constitutional bans on excessive fines as well as state and federal provisions barring violations of due process. It makes no difference whether we examine the issue as an excessive fine or a violation of due process.

The leading United States Supreme Court case on the Eighth Amendment's prohibition of excessive fines is *United States v. Bajakajian* (1998) 524 U.S. 321 [141 L.Ed.2d 314, 118 S.Ct. 2028] (*Bajakajian*), which involved a federal statute (31 U.S.C. § 5316(a)) requiring any person transporting more than $10,000 out of the United States to file a report with the United States Customs Service. Bajakajian attempted to take $357,144 out of the country without filing a report. The government claimed that the entire $357,144 was forfeited.

The high court pointed out that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (*Bajakajian, supra,* 524 U.S. at p. 334.) It then set out four considerations: (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay. (*Id.* at pp. 337–338; see *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1320–1322 [92 Cal.Rptr.2d 418] (*Sainez*).) After reviewing those considerations, the high court held that the forfeiture of Bajakajian's currency constituted an "excessive fine" barred by the Eighth Amendment.

Also pertinent here is this court's decision in *Hale v. Morgan* (1978) 22 Cal.3d 388 [149 Cal.Rptr. 375, 584 P.2d 512]. It involved Civil Code section 789.3, providing for a civil fine of $100 a day against any landlord who willfully deprived a tenant of utility services for the purpose of evicting the tenant. Hale had moved his trailer into Morgan's mobilehome park without Morgan's permission, but the parties agreed that Hale could stay if he paid

rent. Hale never paid any rent, however, and eventually Morgan cut off Hale's utility services. When Hale finally moved out, services had been disconnected for 173 days, so the trial court assessed a fine of $17,300. We held the fine violated the due process clauses of the state and federal Constitutions, citing considerations similar to those the United States Supreme Court discussed in its 1998 decision in *Bajakajian, supra,* 524 U.S. 321. (See *Hale v. Morgan, supra,* 22 Cal.3d at pp. 394–398.) Justice Newman's concurrence in *Hale* expressed the view that the fine also violated the state constitutional provision barring excessive fines. (*Id.* at pp. 407–408 (conc. opn. of Newman, J.).)

Here, the Court of Appeal followed the high court's proportionality analysis in *Bajakajian,* but defendant challenges its analysis of culpability. Defendant maintains that it acted at all times in a reasonable and good faith belief that its 1999 conduct in distributing cigarettes from an enclosed tent or booth was protected by the safe harbor provision of section 118950, subdivision (f). (See our discussion of the Nov. 1999 exchange of letters between defendant and the Atty. Gen., at p. 727, *ante.*) Defendant asserts that it set aside specific places to distribute cigarettes and hired security guards to exclude nonsmokers and minors by requiring each person entering the tent or booth to already have a pack of cigarettes and to present identification showing proof of age. When the Attorney General filed this lawsuit in 2001, defendant stopped distributing free cigarettes.

The trial court and the Court of Appeal, however, viewed defendant's asserted good faith as irrelevant. Both courts relied on this language from our decision in *Hale v. Morgan, supra,* 22 Cal.3d at page 396: "[A] constitutional distinction between those persons who have actual knowledge of a law and those who do not, directly offends the fundamental principle that, in the absence of specific language to the contrary, ignorance of a law is not a defense to a charge of its violation."

The quoted language from *Hale v. Morgan,* however, did not relate to the question whether the fine imposed on defendant landlord in that case was excessive or deprived the defendant of due process of law. It related, instead, to an entirely different issue. The defendant there mistakenly contended that because the statute only imposed a fine for "willfully" depriving a tenant of utility services (Civ. Code, § 789.3), it discriminated in favor of those defendants whose acts were not willful because they were ignorant of the law. We rejected that argument, explaining that the term "willful" required only an intentional act, not knowledge of the act's illegality, and that ignorance of illegality was not a defense. Landlords who intentionally cut off a tenant's utility services were liable for the statutory fine whether or not they knew their action was illegal. (*Hale v. Morgan, supra,* 22 Cal.3d at pp. 395–396.)

*Hale* itself noted the relevance of good faith to the determination whether a fine or penalty is excessive or is a denial of due process. It pointed out that the defendant landlord was "unsophisticated" and had been provoked by the plaintiff tenant into terminating the utility service by the tenant's obstinate refusal either to move or to pay rent. (*Hale v. Morgan, supra,* 22 Cal.3d at p. 388.) And in a more recent decision, *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976 [4 Cal.Rptr.2d 837, 824 P.2d 643], we observed that when a contractor attempted reasonably and in good faith to comply with prevailing wage laws, equitable considerations might preclude imposition of statutory penalties. Thereafter, in *People ex rel. Lungren v. Superior Court, supra,* 14 Cal.4th at page 314, footnote 8, we noted that the defendants' good faith belief "that they were not violating [the statute] . . . [could] make the imposition of statutory penalties a violation of defendants' due process rights."

Court of Appeal decisions also point to the relevance of a defendant's lack of good faith in supporting imposition of a large fine. For instance, in *Sainez, supra,* 77 Cal.App.4th at page 1316, the Court of Appeal noted the defendant's failure to cease its unlawful conduct when notified the conduct was illegal as one reason for upholding the penalty. And in *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 524 [128 Cal.Rptr.2d 463], the Court of Appeal upheld a $2.5 million civil penalty, observing that the defendant insurer continued to sell policies after it had been notified by the Department of Insurance that the policy language was deceptive.

■ For the reasons given above, we here conclude that, although ignorance of the law is not a defense to a violation of section 118950, a defendant's good faith or bad faith is relevant to the evaluation of the fine assessed against the defendant.

Defendant's claim that the Attorney General was aware of defendant's nonsale distribution of cigarettes, but delayed telling defendant that it considered defendant's actions to be illegal, is also relevant to culpability. Defendant asserts that it halted its free distributions of cigarettes immediately after the Attorney General, by bringing this action, put defendant on notice that its actions might be illegal, but by that time many thousands of cigarettes had been distributed and a sizable potential fine had accrued. In *Walsh v. Kirby* (1974) 13 Cal.3d 95 [118 Cal.Rptr. 1, 529 P.2d 33], when the Department of Alcoholic Beverages accumulated evidence of numerous violations before bringing suit, we invalidated the fine because it resulted from the government's practice of accumulating "different but essentially identical violation[s], before it filed its accusation charging the licensee with the whole series of violations and assessing concomitant cumulative penalties." (*Id.*

at p. 98.) Thus, if defendant here can show in the trial court that delay by the Attorney General contributed to the size of the fine levied against defendant, that fact would also be relevant in determining whether the $14,826,200 fine was excessive.

The Attorney General disputes defendant's assertion that defendant acted reasonably and in good faith in distributing free cigarettes. The Attorney General also challenges defendant's assertion that the Attorney General delayed filing this lawsuit in order to let the statutory penalties accumulate against defendant, asserting that he first learned of most of defendant's activities through discovery in this case.

The record thus reveals triable issues of material fact relating to defendant's good faith and to the alleged delay by the Attorney General in bringing this lawsuit. The trial court, however, considered those issues irrelevant to the amount and validity of the $14,826,200 it imposed on defendant. We disagree, and hold that the trial court erred in granting the Attorney General's motion for summary judgment. (See *O'Riordan v. Federal Kemper Life Assurance* (2005) 36 Cal.4th 281, 289 [30 Cal.Rptr.3d 507, 114 P.3d 753].)

Ordinarily a reviewing court, having examined the relevant considerations, can decide for itself whether a fine or penalty is unconstitutionally excessive. (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc., supra,* 532 U.S. at p. 435; *Bajakajian, supra,* 524 U.S. at pp. 336–337, fn. 10.) But that is not the case here. Because defendant's assertions raise factual issues relevant to the question whether the $14,826,200 fine the trial court assessed was unconstitutionally excessive, the truth of those assertions would have to be resolved in the trial court before an appellate court could determine whether the fine was unconstitutionally excessive.

## V. Disposition

We resolve the issues before us as follows: (1) Defendant's conduct is not protected by the safe harbor provision of section 118950, subdivision (f), which permits nonsale distribution on public grounds leased for private functions to which minors are denied access. (2) Section 118950 is not preempted by the FCLAA's bar on state regulation of "advertising *or promotion* of any cigarettes the packages of which are labeled in conformity with the provisions of [the FCLAA]." (15 U.S.C. § 1334(b), italics added.) (3) The $14,826,200 fine imposed against defendant may violate federal and state constitutional prohibitions against "excessive fines." (U.S. Const., 8th Amend; Cal. Const., art. I, § 17.) Resolution of this latter issue will require a trial court hearing to determine whether defendant believed, in good faith, that its conduct conformed to section 118950, and whether the Attorney

General delayed notifying defendant that the conduct violated that statute in order to allow the penalties to accumulate.

The judgment is reversed to the extent that it imposed a fine of $14,826,200 against defendant, and the Court of Appeal is directed to remand the case to the trial court to resolve any disputed issues of fact relating to the assessment of the fine. In all other respects, the judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Bedsworth, J.,* concurred.

On January 18, 2006, the opinion was modified to read as printed above. Chin, J., did not participate therein.

---

*Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.