Filed 3/20/20 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>FERNANDO L. COTA,<br><br>　　Defendant and Appellant. | D074935<br>(Super. Ct. No. SCD277673)<br><br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 26, 2020, is modified on page 4 of the dissent:

Language contained in footnote 9 is deleted in its entirety with the following inserted in its place:

> Statewide, there is a "lack of complete and accurate data on fine and fee collections." (Legis. Analyst, Improving California's Criminal Fine and Fee System (2016) p. 3 <https://lao.ca.gov/reports/2016/3322/criminal-fine-and-fee-system-010516.pdf> [as of February 25, 2020], archived at <https://perma.cc/7HAM-YM8U>.) Available statistics often include infractions, making it difficult to determine the collection and default rates for criminal defendants convicted of felonies and misdemeanors. (See Judicial Council of California, Report to the Legislature: Revenue Collected for Fiscal Year 2018–19 (2019) <https://www.courts.ca.gov/documents/lr-2019-JC-revenue-collected-fy-2018-19-gov-68514.pdf> [as of February 25, 2020], archived at <https://perma.cc/29WE-PPKH>.) But it is clear California collects only a small percentage of what it is

owed each year. Outstanding delinquent debt has increased from five to ten billion in the last decade, while revenue collections have fallen from a peak of $2 billion to $1.4 billion; "these two trend lines propose . . . an ominous prospect for California about the durability and sustainability of a criminal fine, fee and penalty system as a revenue stream . . . ." (Martin Hoshino, Administrative Director of the Judicial Council of the California Courts, updating the Judicial Council on Fines and Fees (Dec. 2019) <https://www.youtube.com/watch?v=3xOvNAv9C-c&t=2s> [as of February 25, 2020], archived at <https://perma.cc/H4YZ-TGG4>.) Much of this delinquent debt may be uncollectable—meaning the cost of collection exceeds the potential recovery. (Legis. Analyst, Governor's Criminal Fine and Fee Proposals (2017) pp. 7–8 <https://lao.ca.gov/reports/2017/3600/Criminal-Fine-Fee-030317.pdf> [as of February 25, 2020], archived at <https://perma.cc/6VUN-WWV7>.)

Los Angeles and San Francisco report low rates of collection. Los Angeles collects as little as nine percent. The county abolished local fees and cancelled associated debt in early 2020. (L.A. County Bd. of Spvrs., Eliminating Los Angeles County Criminal System Administrative Fees (Feb. 18, 2020) pp. 5, 7–9 [Motion] <http://file.lacounty.gov/SDSInter/bos/supdocs/144092.pdf> [as of March 19, 2020], archived at <https://perma.cc/8FU3-KTPC>; County of L.A., Statement of Proceedings for the Regular Meeting of the Board of Supervisors (Feb. 18, 2020) pp. 8–9 [Motion approved] <http://file.lacounty.gov/SDSInter/bos/sop/1069198_021820.pdf> [as of March 18, 2020], archived at <https://perma.cc/K2BJ-BU66>.) San Francisco estimates its collection rate is less than 20 percent. The city abolished local fees and canceled outstanding debt in 2018. (The Financial Justice Project, et al., Criminal Justice Administrative Fees: *High Pain for People*, *Low Gain for Government* (2018) pp. 1, 6 <https://sftreasure.org/sites/default/files/2019-09/Hig%20Pain%20Low%20Gain%20FINAL_04-24-2019.pdf> [as of February 25, 2020], archived at <https://perma.cc/B9E6-CD9F>.)

There is no change in judgment.


HALLER, Acting P. J.


Copies to: All parties

Filed 2/26/20 (unmodified version)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D074935 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD277673) |
| FERNANDO L. COTA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed in part, reversed in part and remanded.

Justin A. Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Fernando L. Cota pled guilty to the felony offense of carrying a concealed dirk or dagger in exchange for three years of probation and the possibility that the charge might be reduced to a misdemeanor at the end of one year. The trial court imposed various probation conditions that Cota objected to in the trial court and challenges on appeal. Based on the Supreme Court's recent decision in *In re Ricardo P.* (2019) 7 Cal.5th 1113, 1122 (*Ricardo P.*), we conclude that the electronics search condition that the court imposed is unreasonable, but remand for further consideration of a potentially appropriate electronics search condition. We uphold the remaining challenged conditions. Cota also challenges the trial court's imposition of various fees and a restitution fine, arguing that due process requires a finding of ability to pay before such charges may be imposed. He requests remand to the trial court for a hearing to consider his ability to pay the fines and fees assessed at sentencing. We conclude that due process does not bar the imposition of the assessments and fine that Cota challenges and that remand on this issue is therefore not required. In all other respects the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Cota was seen swinging a machete attached to a long stick in a San Diego public park. His clothes were visibly soiled. Someone who observed his behavior called the police, describing Cota as a violent mentally ill man. When police arrived, they found Cota standing near a water fountain with the machete balanced on top of the fountain. In view of the officers, Cota sat down and pulled a six-inch drywall knife from his waistband, placing it next to him. The officers arrested Cota for an outstanding misdemeanor warrant after running a records check.

2

Cota was charged with a felony for unlawfully carrying a concealed weapon (dirk or dagger).  (Pen. Code, § 21310.)[1]  He pled guilty to the charge in exchange for a recommendation of three years formal probation and the anticipated reduction of his felony conviction to a misdemeanor once he completed drug treatment and mental health counseling.

The trial court accepted the recommendation and sentenced Cota to three years of probation with several conditions.  Cota objected to a condition compelling him to submit electronic devices for search at any time when required by a probation or law enforcement officer.  He also objected to conditions that he attend anger management counseling and refrain from alcohol use if directed by his probation officer.  The trial court imposed these conditions over Cota's objections.

## DISCUSSION

Cota argues that we should strike the electronics search condition, the anger management condition, and the alcohol use condition as unreasonable.  We agree that permitting warrantless searches of Cota's electronic devices was an abuse of discretion based on the Supreme Court's recent *Ricardo P.* decision.  We uphold the remaining conditions as reasonable.

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

## 1. *Electronics Search Condition*

Cota challenges the electronics search condition as unreasonable because it is unrelated to future criminal conduct. We review probation conditions for abuse of discretion. (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*).)

Trial courts have wide latitude to impose conditions consistent with the twin aims of probation: rehabilitation of the defendant with minimal risk to the community. (§ 1202.7; *People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) Nonetheless, any conditions must be reasonable. (§ 1203.1; see also *People v. Beal* (1997) 60 Cal.App.4th 84, 86 (*Beal*).) A condition of probation will be upheld as reasonable unless it meets all three criteria outlined in *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*): the condition " ' "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality." ' " (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1118; *Olguin*, *supra*, 45 Cal.4th at p. 379.)

The electronics search condition satisfies the first two *Lent* criteria. There was no relationship between electronic devices and the crime Cota pleaded guilty to—possession of a concealed weapon, and using electronic devices is not inherently criminal. Since the condition meets the first two prongs, it can survive review for abuse of discretion only if it regulates conduct that is reasonably related to future criminality.

The California Supreme Court recently clarified that the reasonableness inquiry of *Lent's* third prong "contemplates a degree of proportionality between the burden imposed by a probation condition and the legitimate interests served by the condition." (*Ricardo*

4

*P.*, *supra*, 7 Cal.5th at p. 1122.)[2]  When significant privacy interests are implicated by a probation condition (such as sweeping electronics searches without a warrant), the burden imposed on a defendant is a heavy one.  Such a condition is unreasonable unless it is "proportional to achieving some legitimate end of probation."  (*Id.* at p. 1127.) Reasonableness necessitates "more than just an abstract or hypothetical relationship between the probation condition and preventing future criminality."  (*Id.* at p. 1121.)  In other words, to justify a burdensome condition, there must be a specific relationship— grounded in the facts of the case—between the condition and preventing future criminality.

   *Ricardo P.* involved a juvenile who admitted having committed a felony burglary and subsequently challenged a probation condition allowing warrantless searches of his electronic devices and accounts.  (*Ricardo P.*, *supra*, 7 Cal.5th at p. 1115.)  The trial court justified the search condition as useful in monitoring Ricardo's compliance with the terms of his probation because it allowed officers to look for electronic communications about drugs.  Nothing on the record showed that the juvenile had in fact used his phone to purchase drugs.  The trial court's reasoning was based on a generalization that juveniles use their phones to buy drugs and brag about drug use online.  (*Id.* at p. 1119.)  The Supreme Court struck the condition under *Lent*, finding that the condition was not

---

[2]     *Ricardo P.* was decided after the initial briefing in this case was complete.  We later requested supplemental briefing from the parties on this issue in light of *Ricardo P.*

5

reasonably related to Ricardo's future criminality because it disproportionately burdened his privacy interest without specific and substantial justification. (*Id.* at p. 1126.)

The same issues that were of concern to the Supreme Court in *Ricardo P.* are present in this case. Under the terms of his probation, Cota's electronic devices can be searched at any time without a warrant. This implicates a significant privacy interest. As in *Ricardo P.*, the trial court imposed the condition to make it easier to monitor Cota's compliance with other probation terms.[3] In both cases, the condition was premised on a general assumption that drug users routinely negotiate drug purchases with their phones. There was no reference to Cota's specific actions.[4] A case-specific rationale that would make this burden proportional is no more present here than it was in *Ricardo P.* Mere convenience in monitoring a parolee's conduct, coupled with generic descriptions of how some people use cell phones, are not sufficient to render this burden on Cota's privacy interests reasonable.

The Supreme Court made it clear that "requiring a probationer to surrender electronic devices and passwords to search at any time is . . . burdensome and intrusive, and requires a correspondingly substantial and particularized justification." (*Ricardo P.*,

---

[3] At sentencing, the People explained they were asking for the electronics search condition because "he's got to be successful for a year, and the People feel it's appropriate to have the appropriate tools to monitor him for that year to make sure he's successful."

[4] At sentencing, the prosecutor remarked that "the People think [the electronics search condition is] absolutely appropriate especially in a case in which he's currently involved in drug treatment. . . . [C]ertainly people acquire drugs usually by the means of a cell phone or some other electronic device . . . ."

*supra*, 7 Cal.5th at p. 1126.)  There is no substantial and particularized justification in the record in this case.  The electronics search condition thus meets all three *Lent* criteria and is therefore unreasonable.[5]

Indeed, the People concede in supplemental briefing that the electronics search condition is overly burdensome and request that we remand to permit the trial court to craft a more narrowly tailored search condition.  We do not foreclose the possibility that a narrower electronics search condition might be appropriate in this case based on facts that are not reflected in the current record.  We strike the condition, but do so without prejudice to the People, who may demonstrate to the trial court with additional facts that a more narrowly drawn electronics search condition is proportionate to the burden on Cota's privacy interest.

2.  *Other Challenged Probation Conditions*

Cota argues that the imposition of alcohol-related probation conditions is unreasonable under *Lent* because it is not reasonably related to future criminality.  We disagree.

Defense counsel challenged only one of four alcohol-related conditions at sentencing—8.b.—which requires that Cota not knowingly use or possess alcohol if so directed by his probation officer.  As Cota concedes, any challenge to alcohol-related

---

[5]    Because we find the electronics search condition unreasonable under *Lent*, we need not reach Cota's assertion that the condition is unconstitutionally overbroad.

conditions other than 8.b. is forfeited. (*People v. Welch* (1993) 5 Cal.4th 228, 230.) We therefore proceed to address Cota's challenge to 8.b.

As with Cota's challenge to the electronics search condition, the first two *Lent* criteria are met. Possessing or using alcohol is unrelated to Cota's offense and is legal for someone his age.[6] This leaves the third criterion for our consideration—whether restricting Cota's use and possession of alcohol is reasonably related to his future criminality.

Cota relies on *People v. Kiddoo* (1990) 225 Cal.App.3d 922, in which the appellate court struck a probation condition restricting alcohol use because it was not related to the defendant's offense of possessing methamphetamine. (*Id.* at pp. 927–928.) However, alcohol is a drug—albeit a legal one. This court has previously made clear that "we disagree with the fundamental assumptions in *Kiddoo* that alcohol and drug abuse are not reasonably related and that alcohol use is unrelated to future criminality where the defendant has a history of substance abuse." (*Beal*, *supra*, 60 Cal.App.4th at p. 87; accord *People v. Balestra* (1999) 76 Cal.App.4th 57, 69.)

Cota disclosed to the probation department that he is a habitual user of methamphetamine and a daily user of marijuana. He has prior convictions for being under the influence of a controlled substance, possession of marijuana for sale, possession of a controlled substance, and possession of drug paraphernalia. His history

---

6       We do not find support in the record for the People's speculation that Cota may have been under the influence of alcohol when he was arrested in the park.

of substance abuse is well documented. In the past, in upholding alcohol conditions like the condition that the trial court imposed on Cota, we have noted that there is an empirical nexus between drugs and alcohol. (*Beal*, *supra*, 60 Cal.App.4th at p. 87.) It would make little sense to deprive Cota's probation officer of the power to direct Cota away from alcohol as a substitute mind-altering substance when his substance abuse history is so clearly demonstrated.

The *Beal* court noted that "alcohol use may lead to future criminality where the defendant has a history of substance abuse."[7] (*Beal*, *supra*, 60 Cal.App.4th at p. 87.) We therefore conclude that the trial court's imposition of alcohol-related probation conditions was reasonably related to preventing future crimes, given Cota's history of drug use.

Cota next challenges the anger management condition as unreasonable under the third prong of *Lent*. We conclude that it, too, is reasonable under the circumstances.

Cota cites his lack of convictions for violent crimes and an unclear connection between his crime and displays of anger. But a history of violent crime and overt displays of anger are not necessary preconditions for giving a probation officer discretion

---

[7] Cota asks us to distinguish his case from *Beal* because Beal was charged with a drug crime (*Beal*, *supra*, 60 Cal.App.4th at p. 85), whereas Cota was charged with illegally possessing a weapon. While we recognize that Cota's case differs factually from Beal's in this respect, review of a probation restriction on alcohol use is a fact-specific inquiry. (*People v. Lindsay* (1992) 10 Cal.App.4th 1642, 1644.) The fact that Cota was not, in this instance, convicted of a drug-related offense would clearly be relevant to *Lent's* first prong, but it does not mean that the reasoning in *Beal* with respect to an alcohol condition being reasonably related to future criminality is inapplicable to Cota's situation.

9

to direct a probationer to an anger management program. Several facts in the record make the condition reasonable. Cota encountered the police because he was swinging a machete in a public park, and he frightened someone enough to prompt a call to law enforcement. The caller described Cota as violent and mentally ill. When the police arrived, Cota revealed another weapon—the six-inch knife that led to the charge of which he was ultimately convicted. He has a prior conviction for the manufacture of weapons and has been diagnosed with schizoaffective disorder.[8] These facts could reasonably lead the trial court to conclude that Cota might benefit from anger management and that such a tool could help prevent future criminal activity.[9]

3. *The trial court did not violate Cota's right to due process in imposing various fees and a restitution fine without first determining his ability to pay*

At his sentencing in November 2018, Cota was assessed a $40 court operations fee (§ 1465.8), a $30 criminal conviction fee (Gov. Code, § 70373), a $300 minimum restitution fine (§1202.4, subd. (b)), and a $30 county collection fee (*id.*, §1202.4, subd.

---

[8] Clinical evidence links schizophrenic conditions with violence. This correlation is exacerbated with comorbid substance abuse. (Walsh et al., *Violence and schizophrenia: examining the evidence* (June 2002) British Journal of Psychiatry, Vol. 180, pp. 490–495.) We do not intend to imply that all people with schizophrenic conditions are prone to violence. Rather, we merely observe that it is not irrational to consider Cota's mental health in determining the reasonableness of an anger management program.

[9] The court's imposition of anger management was qualified; the court invested Cota's probation officer with the authority to direct Cota to a program if the officer deems it a helpful supplement to his other mental health treatment. Creating this option seems manifestly reasonable to us given the facts of the case.

(l)).  Cota did not challenge the fine or fees and the trial court did not conduct a hearing to determine his ability to pay.

Two months after Cota's sentencing hearing, the Court of Appeal decided *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), holding that criminal defendants have a due process right to an ability to pay hearing before fines and fees are imposed.  (*Id.* at p. 1172.)  Cota relies on *Dueñas* to argue that he is entitled to such a hearing.

The People's primary response to Cota's argument is that any ability to pay argument was forfeited because he did not object to the fines and fees at sentencing.  We exercise our discretion to consider Cota's claim on the merits, notwithstanding any possible forfeiture.  (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [reviewing courts have discretion to excuse forfeiture].)

In *Dueñas*, *supra*, 30 Cal.App.5th 1157 at page 1167, the court held that due process precludes a trial court from "impos[ing]" certain assessments and fines when sentencing a criminal defendant in the absence of determination that the defendant has a "present ability to pay" those assessments and fines.  Specifically, *Dueñas* held that "due process of law requires [a] trial court to . . . ascertain a defendant's present ability to pay before it imposes" (1) "court facilities and court operations assessments" (under § 1465.8 and Gov. Code, § 70373, respectively), or (2) a restitution fine (under § 1202.4).  (*Dueñas*, *supra*, at pp. 1164, 1167, 1172.)

More recently, however, another Court of Appeal opinion questioned whether "*Dueñas*'s expansion of the boundaries of due process" to provide an additional "protection not conferred by either [of *Dueñas*'s] foundational pillars" is a "correct

11

interpretation," and ultimately concluded that it is not. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 327, review granted Nov. 26, 2019, S258946 (*Hicks*).) In considering the issue, the *Hicks* court noted that *Dueñas* rests on "two strands of due process precedent," the first of which "secures a due process-based right of access to the courts" (italics omitted), and the second of which "erects a due process-based bar to incarceration based on the failure to pay criminal penalties when that failure is due to a criminal defendant's indigence rather than contumaciousness." (*Id.* at p. 325–326.) *Hicks* explains, neither of these strands "dictate[s]" *Dueñas*'s result. (*Id.* at p. 326.) For this reason, and because *Dueñas* "is inconsistent with the purposes and operation of probation" (*id.* at p. 327), the court in *Hicks* concluded that "*due process* does not speak to [the] issue [of how best to balance the competing interests of indigent defendants and an operable court and victim restitution system] and . . . *Dueñas* was wrong to conclude otherwise." (*Id.* at p. 329, first italics added.)

We find the *Hicks* court's analysis of the due process issue to be persuasive, and adopt the holding in *Hicks* that "[n]either strand [of due process precedent] bars the imposition of [the] assessments and the . . . restitution fine" even as to a defendant who is unable to pay. (*Hicks*, *supra*, 40 Cal.App.5th at p. 329.) Like the defendant in *Hicks*, Cota has not, to date, been denied access to the courts or been incarcerated as a result of the imposition of these financial obligations. No remand for an ability to pay hearing is therefore necessary.

## DISPOSITION

We strike the electronics search condition and remand to the trial court to permit the court to attempt to fashion a more narrowly drawn electronics search condition, consistent with this opinion. We uphold all other probation conditions and the fine and fees that the trial court imposed. In all other respects the judgment is affirmed.


AARON, J.

I CONCUR:

HALLER, Acting P. J.

13

Dato, J., Concurring and Dissenting.

I join the majority opinion's conclusions as to each of Fernando Cota's challenges to the conditions of his probation, but depart from its determination that he is not entitled to remand for a hearing on his ability to pay the imposed fines and fees.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Velia Dueñas sought relief from a poverty-driven cycle of debt-to-incarceration. As a teenager, she incurred three citations and over $1000 in assessments. When she could not pay, the state suspended her driver's license. She could not afford the fees for reinstatement and accumulated misdemeanor convictions and further debt from driving on the suspended license. When given the choice, she opted for incarceration over incurring further debt for nonpayment. The court of appeal agreed with Dueñas that imposing fines and fees[1] on defendants without consideration of their ability to pay violates due process. (*Id.* at pp. 1161, 1164.)

That Dueñas was a homeless mother of two with cerebral palsy undoubtedly highlighted the unfairness of her situation. But her appeal called attention to issues of broad and increasing significance: whether and to what extent is it appropriate to finance government services—in particular, the judicial system—with fines and fees assessed against convicted criminal defendants? And what recourse does an indigent defendant have to challenge the imposition of fines and fees on the basis that he or she lacks the ability to pay?

---

1    Specifically, *Dueñas* addressed the imposition of a restitution fine (Pen. Code, § 1202.4), court operations fee (Pen. Code, § 1465.8), and court facilities fee (Gov. Code, § 70373).

Fines have long been a part of criminal sentencing.[2]  But fees are a relatively

recent addition, coinciding with the exponential growth of the American correctional

population in the last 40 years.[3]  As criminal justice costs skyrocketed,[4] states

increasingly sought to offset expenditures without raising taxes.[5]  Between the early-

1980's and the mid-2000's, the national percentage of prisoners who were assessed fees

and fines rose from about 12 percent to over 65 percent,[6] making monetary sanctions a

fixture of the criminal justice system.  California has been no exception to this national

---

[2]     See Gorod & Frazelle, *Timbs v. Indiana:  Mere Constitutional Housekeeping or the Timely Revival of A Critical Safeguard?* (2019) Cato Sup. Ct. Rev., 215, 222.

[3]     See generally Bureau of Justice Statistics, Prisoners Series <https://www.bjs.gov/index.cfm?ty=pbse&tid=0&dcid=0&sid=40&iid=0&sortby=&page=paging&curpg=1> [as of February 25, 2020], archived at <https://perma.cc/GEM9-FSGA>.

[4]     "From 1983 to 2012, criminal justice costs grew by more than 650 percent. One study found that the cost of the expansion in the criminal justice system during the thirty-year period was $3.4 trillion. By 2012, criminal justice costs were over $270 billion[.]" (Sobol, *Fighting Fines & Fees:  Borrowing from Consumer Law to Combat Criminal Justice Debt Abuses* (2017) 88 U. Colo. L.Rev., 841, 857, fns. omitted.)

[5]     See Martin et al., *Shackled to Debt:  Criminal Justice Financial Obligations and the Barriers to Re-Entry They Create* (2017) U.S. Department of Justice, National Institute of Justice, p. 4 <https://www.ncjrs.gov/pdffiles1/nij/249976.pdf> [as of February 25, 2020], archived at <https://perma.cc/YJ9R-PBNK>; see also Counsel of Economic Advisers Issue Brief:  *Fines*, *Fees and Bail*, *Payments in the Criminal Justice System that Disproportionately Impact the Poor* (Dec. 2015) p. 2 <https:// obamawhitehouse. archives.gov/sites/default/files/page/files/1215_cea_fine_fee_bail_ issue_brief.pdf [as of February 25, 2020], archived at <https://perma.cc/42ME-8ZGD>.

[6]     See Harris et al., *Drawing Blood from Stones*:  *Legal Debt and Social Inequality in the Contemporary United States* (2010) 115 American Journal of Sociology, 1753, 1769–1770 (hereafter Harris et al.).

trend.[7]  Indeed, two of the three fees in Cota's case are authorized by statutes aimed at revenue generation that were passed in the 2000's.  (Pen. Code, § 1465.8; Gov. Code, § 70373; see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.)

Four decades into this monumental shift, two realities have become clear:  fines and fees put a significant burden on indigent defendants,[8] and these defendants (who constitute the vast majority of defendants in the criminal system) cannot pay their court-

---

[7]  As of 2006, the state had "over 269 separate court fines, fees, forfeitures, surcharges . . . [from] statutes in 16 different government codes . . . in addition to the many fees, fines, and special penalties that local governments may impose on most offenses."  (Nieto, *Who Pays for Penalty Assessment Programs in California?* (2006) California Research Bureau, p. 1 <https://csgjusticecenter.org/wp-content/uploads/2013/07/2006-CA-report.pdf> [as of February 25, 2020], archived at <https://perma.cc/CM8K-6DXR>.)

[8]  Defendants often struggle to pay their fines and fees and can carry the debt long-term.  This "indebtedness contributes to the accumulation of disadvantage in three ways: by reducing family income; by limiting access to opportunities and resources such as housing, credit, transportation, and employment; and by increasing the likelihood of ongoing criminal justice involvement."  (Harris et al., *supra*, p. 1756; see Colgan, *Reviving the Excessive Fines Clause* (2014) 102 Cal. L.Rev. 277, 284–295.)

related debts.[9] By any metric, the experiment of leveraging compulsory user fees to fund the justice system has been less than an unqualified success for governments and a personal tragedy for many individuals.

The problem has now captured the attention of key figures in the legal profession. The American Bar Association identified monetary sanctions as a primary factor in the

---

[9] Statewide, there is a "lack of complete and accurate data on fine and fee collections." (Legis. Analyst, Improving California's Criminal Fine and Fee System (2016) p. 3 <https://lao.ca.gov/reports/2016/3322/criminal-fine-and-fee-system-010516.pdf> [as of February 25, 2020], archived at <https://perma.cc/7HAM-YM8U>.) Available statistics often include infractions, making it difficult to determine the collection and default rates for criminal defendants convicted of felonies and misdemeanors. (See Judicial Council of California, Report to the Legislature: Revenue Collected for Fiscal Year 2018-19 (2019) <https://www.courts.ca.gov/documents/lr-2019-JC-revenue-collected-fy-2018-19-gov-68514.pdf> [as of February 25, 2020], archived at <https://perma.cc/29WE-PPKH>.) But it is clear California collects only a small percentage of what it is owed each year. Outstanding delinquent debt has increased from five to ten billion in the last decade, while revenue collections have fallen from a peak of $2 billion to $1.4 billion; "these two trend lines propose . . . an ominous prospect for California about the durability and sustainability of a criminal fine, fee and penalty system as a revenue stream . . . . (Martin Hoshino, Administrative Director of the Judicial Council of the California Courts, updating the Judicial Council on Fines and Fees (Dec. 2019) <https://www.youtube.com/watch?v=3xOvNAv9C-c&t=2s> [as of February 25, 2020], archived at <https://perma.cc/H4YZ-TGG4>.) Much of this delinquent debt may be uncollectable—meaning the cost of collection exceeds the potential recovery. (Legis. Analyst, Governor's Criminal Fine and Fee Proposals (2017) pp. 7–8 <https://lao.ca.gov/reports/2017/3600/Criminal-Fine-Fee-030317.pdf> [as of February 25, 2020], archived at <https://perma.cc/6VUN-WWV7>.)

Los Angeles and San Francisco report low rates of collection on local fees. Los Angeles may collect as little as four percent. (County of Los Angeles, Chief Executive Office, Report Back on Addressing Fines and Fees Associated with Criminal Justice System Involvement (Dec. 13, 2019) p. 59 <http://file.lacounty.gov/SDSInter/bos/bc/1065611_121319.B101299.FinesandFees.bm.pdf> [as of February 25, 2020], archived at <https://perma.cc/2484-ML6G>.) San Francisco estimates its collection rate is less than 20 percent. The city abolished local fees and canceled outstanding debt in 2018. (The Financial Justice Project, et al., Criminal Justice Administrative Fees: *High Pain for People*, *Low Gain for Government* (2018) pp. 1, 6 <https://sftreasure.org/sites/default/files/2019-09/Hig%20Pain%20Low%20Gain%20FINAL_04-24-2019.pdf> [as of February 25, 2020], archived at <https://perma.cc/B9E6-CD9F>.)

4

erosion of public trust in the justice system and has suggested reforms, such as considering an individual's ability to pay "at each stage of proceedings, including at the time the fees are imposed and before imposition of any sanction for nonpayment . . . ." (ABA, Ten Guidelines on Court Fines and Fees (Aug. 2018), Guidelines 1 & 2[10].)  A task force convened by the National Center for State Courts has similarly released a practice guide that emphasizes safeguards based on ability to pay, including granting judges discretion to "impose Legal Financial Obligations based on an individual's income and ability to pay."  (See Nat. Center for State Cts., National Task Force on Fines, Fees, and Bail Practices, Principles on Fines, Fees, and Bail Practices (2019), principle 6.2, p. 6[11].)  Here in California, our Chief Justice underscored the urgency of this issue in her 2019 State of the Judiciary address, stating that we "must ensure . . . fines and fees no longer fall on those least able to afford them."  (Tani G. Cantil-Sakauye, Chief Justice of the Cal. Supreme Ct., State of the Judiciary address to the Cal. Legis. (Mar. 19, 2019)[12].)  Echoing her concerns, the Administrative Director of California's Judicial Council has remarked that fines and fees create a "destitution pipeline."  Among other reforms, he

---

[10]     <https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent _defendants/ls_sclaid_in d_10_guidelines_court_fines.pdf> [as of February 25, 2020], archived at <https://perma.cc/EZ54-PYRN>.

[11]     <https://www.ncsc.org/~/media/Files/PDF/Topics/Fines%20and%20Fees/ Principles%201%2017%2019.ashx> [as of February 25, 2020], archived at <https://perma.cc/R72D-CUVQ>.

[12]     <https://newsroom.courts.ca.gov/news/2019-state-of-the-judiciary-address> [as of February 25, 2020], archived at <https://perma.cc/QN5Q-6J9P>.

suggests setting fees in accordance with individual ability to pay.  (Levi et al., *Fixing Fees*, *Fines & Bail:  Toward a Fairer System of Justice* (2019) vol. 103, No. 3, Judicature, at pp. 17–19 [comments of Martin Hoshino, Administrative Director of the Judicial Council of the California Courts][13].)

So there is a problem.  But is it a *constitutional* problem?  In summary fashion, and relying exclusively on *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted November 26, 2019, S258946 (*Hicks*), the majority dismiss Cota's arguments as devoid of any legitimate constitutional concerns.  *Hicks*, we are told, persuasively concluded that *Dueñas* got it wrong when it comes to a due process analysis.  Cota wasn't denied access to the courts, and he wasn't incarcerated for failing to pay any fines or fees.  That's the sum and substance of the due process guarantee.  If there is a problem, it's the Legislature's to address.

But is there more to it?

In the year since its filing, the *Dueñas* decision has generated abundant discussion and debate.  Outside of *Hicks*, however, the bulk of that discussion has not concerned *whether* a criminal defendant's ability to pay has any role to play in defining a constitutional threshold for the assessment of fines and fees.  Rather, the principal debate has focused on *how* to frame and analyze a constitutional challenge, and specifically whether due process principles or the Eighth Amendment's Excessive Fines Clause provide the most appropriate vehicle for the analysis.

---

13      <https://judicature.duke.edu/articles/fixing-fees-fines-bail-toward-a-fairer-system-of-justice/> [as of February 25, 2020], archived at <https://perma.cc/V3CG-FA6R>.

The essence of Cota's argument is that certain fines and fees, even though they are "mandatory" by terms of the applicable statute, cannot be constitutionally imposed on him because he has no ability to pay them. Cota requests a hearing at which he can present evidence of his inability to pay. Because his opening brief was filed less than three months after *Dueñas* was decided, Cota's counsel understandably relied on a due process analysis, but the particular constitutional label he attaches to his argument is unimportant. (See *City of Revere v. Massachusetts General Hosp.* (1983) 463 U.S. 239, 243−244 [plaintiff's claim, mislabeled as an Eighth Amendment issue, properly found to be a violation of due process].) The critical question is whether a defendant's ability to pay is appropriately considered in determining whether there are constitutional limitations on the amounts of fines and fees imposed. If it is, Cota should be afforded a hearing at which he can attempt to make his case.

The United States Supreme Court "has long been sensitive to the treatment of indigents in our criminal justice system." (*Bearden v. Georgia* (1983) 461 U.S. 660, 664.) The Due Process Clause provides a general framework to "analyze the fairness of relations between the criminal defendant and the State." (*Id.* at p. 665; see *id.* at pp. 672−673 [revoking probation based on a failure to pay without finding such failure was willful "would be contrary to the fundamental fairness required by the Fourteenth Amendment"].) Although *Dueñas* applied a due process framework, another approach invokes the Eighth Amendment, which aims "to limit the government's power to punish." (*Austin v. United States* (1993) 509 U.S. 602, 609 (*Austin*).) Tracing its roots to Magna Carta, the Excessive Fines Clause restricts the government's power to extract payments as

7

punishment for some offense. (*Timbs v. Indiana* (2019) \_\_\_ U.S. \_\_\_, [139 S.Ct. 682, 687] (*Timbs*).) Sanctions fall within the scope of this clause if they are at least *partly* punitive. (*Austin*, at p. 621 [rejecting argument that civil in rem forfeiture was not punitive simply because "the forfeited assets serve to compensate the Government for the expense of law enforcement activity and for its expenditure on societal problems"].)

One of the flaws in *Hicks*, *supra*, 40 Cal.App.5th 320, review granted—and in the majority's reliance on it here—is its failure to even consider an alternative Eighth Amendment analysis, applicable to some or all of the fines and fees, that would include an evaluation of the defendant's ability to pay.[14] Even as they have questioned aspects of its due process reasoning, several post-*Dueñas* opinions have recognized that a defendant's ability to pay is an appropriate and sometimes critical factor in applying the Eighth Amendment's Excessive Fines Clause. Indeed, the California Supreme Court has acknowledged that both due process and Eighth Amendment analyses incorporate similar concepts—including ability to pay—and that it often "makes no difference whether we examine the issue as an excessive fine or a violation of due process." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728.) *Dueñas* made the

---

[14] In *People v. Caceres* (2019) 39 Cal.App.5th 917, the court rejected a *Dueñas* due process challenge and declined to discuss an Eighth Amendment approach suggested by the Attorney General, citing a case for the generic proposition that an appellate court can refuse to consider issues not properly raised in the opening brief. (*Id.* at p. 923.) But the *issue* here *has* been properly raised—whether criminal defendants may be constitutionally assessed fines and fees in an amount they have no ability to pay. The only defect, if there is one here or in *Caceres*, is defense counsel's failure to attach the right constitutional label to the argument. A mistake in labeling is an insufficient basis to refuse even to consider an otherwise proper and potentially meritorious argument.

same observation in charting its course. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1171, fn. 8; see also *People v. Belloso* (2019) 42 Cal.App.5th 647, 660.)

Given the procedural posture of this case—Cota has never had a hearing at which he could present evidence of his financial condition—it is unnecessary at this juncture to extensively analyze or definitively resolve *how* a defendant's ability to pay should affect the imposition of fines and fees. I am inclined to agree with those courts, including ours, that have preferred an Eighth Amendment analysis at least as to fines such as the restitution fine in this case. (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, 96, rev.gr. Nov. 13, 2019, S257844; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1071.) Fines are clearly punitive, and given an available Eighth Amendment analysis that considers ability to pay (along with other factors), the safety net provided by broader principles of due process seems unnecessary.[15] Whether fees and assessments imposed on convicted defendants are sufficiently punitive to invoke the Eighth Amendment presents a closer question, but we must keep in mind that the standard asks merely whether they are *partially* punitive. (*Austin*, *supra*, 509 U.S. at pp. 610, 621; see *Timbs*, *supra*, 139 S.Ct. at p. 689 [noting in an Eighth Amendment discussion that " 'state and local governments nationwide increasingly depend heavily on fines and fees as a source of general revenue' "]; *Aviles*, *supra*, at p. 1071 [applying an Eighth Amendment analysis to both fines and fees]; see also Colgan, *The Excessive Fines Clause: Challenging the*

___

15      "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " (*Albright v. Oliver* (1994) 510 U.S. 266, 273.)

*Modern Debtor's Prison* (2018) 65 UCLA L.Rev. 2, 35–40 [suggesting fees are partially punitive].)

We will have plenty of time to debate doctrinal nuances *after* Cota has been afforded the opportunity to make a complete record.  At this point, however, it is sufficient to conclude that he should have the chance to prove the extent of his inability to pay the assessed fines and fees as well as to argue—based on either the Eighth Amendment, or the Due Process Clause, or both—why his inability makes their impositions constitutionally invalid.


DATO, J.